**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles H. GRIER and Isaac Harper, Defendants–Appellants.**

**Nos. 86–2837, 86–2838.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1988.

Decided Jan. 11, 1989.

Rehearing and Rehearing En Banc Denied Feb. 8, 1989.

---

Thomas Nelson, Milwaukee, Wis., Robert Handelsman, Chicago, Ill., for defendants-appellants.

Francis D. Schmitz, Asst. U.S. Atty., John E. Fryatt, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before BAUER, Chief Judge, and WOOD and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Charles H. Grier and Isaac Harper were convicted of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and of utilization of a communication facility in furtherance of the conspiracy in violation of 21 U.S.C. § 843(b). Although Grier and Harper were also indicted for possession of cocaine with intent to distribute in violation

of 21 U.S.C. § 841(a)(1), the jury returned convictions for a lesser included offense of possessing cocaine. Grier and Harper appeal their convictions. We affirm.

## I. FACTUAL BACKGROUND AND DISTRICT COURT PROCEEDINGS

Charles H. Grier and Isaac Harper were among twelve defendants charged with drug violations in a 37–count indictment and tried before a jury with three other co-defendants. The indictments resulted from an extensive drug-trafficking investigation of another co-conspirator, Anthony F. Pipito (Pipito). The Federal Bureau of Investigation, in coordination with other law enforcement agencies, conducted the investigation. As part of the investigation, a court-authorized wire tap monitored conversations on Pipito's telephone at his Jackson Street apartment and on an extension of that telephone at Pipito's Prospect Avenue condominium from October 25, 1984, to November 30, 1984. Both residences were located in Milwaukee, Wisconsin. A pen register device recorded the telephone number called as well as the time of *outgoing* numbers called. The pen register also recorded the telephone numbers of the outgoing calls. The pen register malfunctioned and failed to record the telephone numbers of the outgoing calls from October 25, 1984, through October 29, 1984. In addition, a "trap and trace" mechanism recorded the originating numbers of incoming calls. Surveillance was also conducted with hidden microphones.[1]

The wire tap and electronic surveillance disclosed that Pipito left Milwaukee for Florida on November 16, 1984, and returned on November 23, 1984. His co-conspirator Joseph Basile returned by car the following morning with a load of cocaine, which he delivered to Pipito. Pipito packaged the cocaine immediately.

Pursuant to a search warrant, Pipito's Prospect Avenue condominium was searched by law enforcement authorities a week later during the evening of November 30, 1984. Approximately five and three-quarter pounds (2,636.81 grams) of cocaine was found in his condominium's basement storage locker. The cocaine was packaged in separate bags and varied in purity from 72 percent to 90 percent. Substances used to dilute ("cut") the drugs were also found in a storage locker.

At trial Pipito's 23–year–old son, Anthony M. Pipito ("Anthony Jr." or "Pipito Jr."), testified concerning his father's cocaine business.[2] Prior to his testimony at this trial, Anthony Jr. pled guilty to participating in Pipito's drug conspiracy, was convicted, and was serving a two-year sentence. Anthony Jr. stated that he moved into Pipito's Jackson Street apartment with his father and his father's girlfriend (co-conspirator Gail Shill) on April 17, 1984, after his release from a halfway house for a prior non-drug conviction. Anthony Jr. moved to a condominium on Prospect Avenue on or about September 4, 1984, his father joined him in October 1984, and both continued to reside at this address through November 1984.

Anthony Jr. also testified about the organization, nature and scope of his father's drug conspiracy. He stated that he received and handled telephone orders for cocaine for his father, counted money, assisted in testing the drug's purity and conveyed money from time to time to a safety deposit box. Pipito's cocaine sources were two Colombians living in Florida. During the period between April and November 1984, Pipito took frequent trips to Florida to obtain drugs. Anthony Jr. testified that in April 1984 Pipito and Gail Schill were selling about five kilos (approximately 20 pounds) of cocaine per month. He also testified that as of November 1984, Pipito's total cocaine sales increased to three to four kilos a week, with individual sales ranging from one-eighth of an ounce to one-quarter of a pound. The thriving nature of Pipito's drug conspiracy in November 1984 was also reflected in a November

---

1. This electronic surveillance was conducted pursuant to a court order from November 14, 1984, to November 30, 1984.

2. Anthony Pipito Sr. was convicted and sentenced to 121 years for various drug-related crimes.

4, 1984, recorded telephone conversation between Grier and Pipito in which Pipito stated that he had a beeper, a statement from which the jury could infer that the magnitude of his drug business had increased to such a degree that he now needed a beeper to serve his cocaine business.

With respect to Grier's involvement in the conspiracy, the government introduced recordings of 12 intercepted telephone conversations between Grier and/or his wife (Beverly) and Pipito. Nine of these phone calls were identified through the trap and trace procedure as originating from Beverly Grier's phone or through the pen register as outgoing calls from the Pipito condominium to Grier's phone. The intercepted telephone calls included a series of three calls made on October 29, 1984, with Grier asking Pipito if he could bring him "a couple of beers," and Pipito agreeing to make the delivery. During these three calls Pipito referred to Grier as "Chuck," and in one of the telephone conversations Pipito confirmed Grier's address with "Bev" (Grier's wife). At trial the manager of Grier's apartment complex identified Grier and testified that Grier had lived at the address recited in the telephone conversation with his wife, Beverly. During a November 2, 1984, phone call, Pipito asked Grier whether he wanted "a deuce." Grier again responded "Yea, a couple of beers." And later that same day Pipito called Charles Grier and referred to him as "Charles," Grier's true name. In recorded telephone conversations between Grier and Pipito on November 4, November 8, and November 12, 1984, arrangements were made for Grier to stop by "for a couple of beers."

Based upon the context of the time and other recorded conversations, it is clear that Grier used the term "beers" as a code word for drugs. As we recently noted in *United States v. Vega*, 860 F.2d 779, 795 (7th Cir.1988): "[C]ode words [are] always used by drug conspirators when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted." Similarly, in *United States v. Alvarez*, 860 F.2d 801, 813–15 (7th Cir.1988), we addressed the question of code language for drugs in rejecting a con-

tention that the evidence was insufficient to convict because the defendant's telephone conversations made no reference to narcotics. We relied on testimony from an experienced DEA undercover detective concerning the use of code words:

> "Agent Arroyo testified that narcotics conspirators used code words as a matter of course in transacting their illicit business. For example, the words 'girl, white, shirt—those are about the most common ones that are used [to mean cocaine].' Agent Arroyo then went on to testify that '[y]ou can tell [that a word is a drug reference] by putting the word that they are talking about into the context of the whole telephone call conversation.' As he further testified:
>
>> '[I]f it is a person with a business, let's just say a grocery store owner, if I was talking to him on the telephone and I wanted to order some cocaine, he might say, "Do you want to buy one onion," referring to onion being white and that being cocaine.
>>
>> If I wanted to buy some, let's say, heroin, he would say, "Do you want to buy one avocado," being dark, being the heroin.'
>
> Thus, where an Italian-cuisine restauranteur was conducting a narcotics transaction on the telephone with one of the appellants, the restauranteur testified that his use of the words 'food' and 'spaghetti' were code words for cocaine."

*Alvarez*, 860 F.2d at 813–14 (citations omitted). We then went on to apply this analysis to specific conversations of the involved defendant, Gustavo Holguin, including these two:

> "Concerning evidence offered directly against Mr. Holguin, the government introduced a transcript of a conversation between Mr. Holguin and Rudy in which Mr. Holguin informed Rudy that '[t]oday I couldn't get but two boxes of filters, you know?' The government contends that the reasonable inference of the code words 'boxes' and 'filters' is cocaine. Support for the government's position is found in the same conversation. For instance, Mr. Holguin told Rudy that a

future shipment of 'boxes' will cost 'around eight and a half.' At trial, Agent Arroyo testified that if the price of cocaine was $38,000, the seller 'could either say to me, "It's 38." He could say to me, "It's 800." He could say to me, "It's 8," and I would understand that that one kilo is going to cost me $38,000.'

In another conversation between Mr. Holguin and Rudy, Mr. Holguin said, 'I'll make a special flight and bring you a sample so you can see it, analyze it.' Rudy responded, '[g]o on then, but send me something to mix with this, so that together they come out.' We think that a reasonable jury could easily have inferred from this conversation that Rudy was disappointed with the quality of cocaine that previously had been supplied by Mr. Holguin. Accordingly, Mr. Holguin was sending Rudy a sample of purportedly better quality cocaine. It also suggests that Rudy wanted some substance to mix with the inferior cocaine to make it more salable."

*Id.* at 814 (citations and footnote omitted).

Grier telephoned Pipito on November 24, 1984, shortly after Pipito's return from Florida and asked Pipito, "How was your trip?" Pipito said that his trip was "good" and asked Grier if he wanted to stop by, to which Grier replied that he was "thirsty as hell" and "could use about four beers." An FBI agent testified that approximately 40 minutes later that same evening he saw a black male leave Pipito's condominium complex and enter a Cadillac parked in front of the entrance.[3] The Cadillac was registered to Charles Grier. The agent attempted to follow the vehicle, but lost the car in traffic near Grier's residence. The next day (November 25, 1984) the FBI intercepted a phone call between Gail Schill and Pipito during which Pipito confirmed that he "fronted stuff" to "Larry,"

"Chuck" and "Darryl" and referred to "Chuck" as a black.[4]

Additional evidence of Grier's involvement in the conspiracy was obtained in a search warrant investigation of Grier's apartment during the evening of November 30, 1984. In that search a "dial-o-gram" scale, a plate, and a straight-edge razor were seized, each of which had a white powdery substance or residue on them.[5]

Further evidence relating to Grier's participation in the enterprise was Pipito Jr.'s testimony that he drove Gail Schill to an apartment building in the vicinity of the Grier apartment at Pipito's direction, and while they (Pipito Jr. and Schill) were at the apartment, he observed Schill and a person he described as an "older black man" known as "Chuck" using cocaine.

The evidence of Harper's involvement in the conspiracy includes a number of recorded telephone conversations between Harper and/or his wife and Pipito. These conversations were "couched in evasive language, obviously to avoid the mention of cocaine." *United States v. Giangrosso,* 779 F.2d 376, 382 (7th Cir.1986). The first such recorded conversation occurred on October 31, 1984, wherein Pipito asked Harper if he could see Harper, and Harper replied to Pipito, "Why you got somethin'?" Pipito responded, "Sure," and Harper stated that he could "bring one and save the trip." On November 6, 1984, Harper called Pipito and, among other things, told Pipito that "things are just slow." During the same conversation Pipito asked Harper if he wanted Pipito to bring him anything, to which Harper replied, "Just one." Pipito phoned Harper later in the day and spoke to Mrs. Harper. She stated that "he [Harper] was not there." Pipito replied that "he wanted me to bring something, but I don't know if I should bring it or not because it's ... pretty much powder." Mrs.

---

**3.** Grier is black.

**4.** A Drug Enforcement Administration agent testified that "fronting" in drug language means the advancing of money or drugs by someone either in anticipation of a delivery of drugs or the hoped-for return of money following the sale of drugs.

**5.** A Drug Enforcement Administration chemist testified that the results of a preliminary gas chromatograph screen of the substances or residues on the items, in the chemist's words, "indicated the presence of cocaine."

Harper then stated that Pipito didn't "even have to worry about it then." Pipito told her that something would be coming to Pipito on Friday. Mrs. Harper informed Pipito that he could stop by the Harper residence, and Pipito agreed to do so. Again on November 8, 1984, Pipito called Harper once more, and Harper replied that he was waiting for Pipito. Pipito then queried Harper concerning whether Harper wanted "a full quarter," to which Harper confirmed he did. On November 26, 1984, shortly after Pipito's return from Florida, Harper, in a phone conversation with Pipito, stated that he was "starvin' to death." Thereafter, Pipito agreed to bring "a couple of things to show" Harper. During the same conversation Harper complained about Pipito's not contacting him sooner. Harper said that Pipito was "supposed to contact [him at] the time you got it back." Pipito responded that he "didn't get back till late Friday night," that he "didn't have nothing here until Saturday morning," and that he had tried to call Harper on Saturday.

Additional evidence of Harper's involvement in the conspiracy was obtained in a November 30, 1984, search of Harper's residence authorized by a warrant. At trial, an FBI agent testified that upon entry into the Harper residence, Harper and a woman identified as Mrs. Harper were sitting "on the couch," were handed a copy of the search warrant and informed that a search of the premises was going to be conducted. Harper was asked "where he kept it or the cocaine." At this time Mr. and Mrs. Harper were "allowed . . . to discuss the issue privately." Thereafter, Harper walked into the kitchen, took out a "Country Time" lemonade can and "handed it to the search agents." Inside the lemonade can were plastic bags containing a white powdery substance. A DEA chemist identified and

testified that the total contents of all of the plastic bags in the lemonade can were 35.46 grams (approximately 1¼ ounces) of 49 percent pure cocaine.[6] The search of the Harper residence also yielded a scale with traces of cocaine upon it, a second scale (a dial-o-gram model), a plate with traces of cocaine, two loaded revolvers, and one unloaded revolver.[7] An FBI agent testified that a piece of paper was also found in Harper's apartment reflecting handwritten notes listing the phrases "eight Ball," [8] "one G," "one hundred cash," names and other numbers.

Further evidence against Harper included Anthony Jr.'s testimony that Pipito once told Anthony Jr. that Pipito had to see someone named Isaac "on business." Anthony Jr. recalled driving his dad's car to a residence in the vicinity of Harper's apartment, but could not recall the specific address. Anthony Jr. testified that, while at "Isaac's" residence, his father had him count approximately $2,000 in cash that Isaac had given Pipito, an amount that corresponded with the "average price for an ounce of cocaine." Finally, during the search of co-defendant Jackson's residence, a page of a notebook was found containing the name "Harper" followed by the telephone number of the Harper residence.[9]

The trial took place September 16–29, 1986, and the jury found Grier and Harper guilty of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, utilization of a communications facility (telephone) in furtherance of the conspiracy in violation of 21 U.S.C. § 843(b), and of possession of cocaine in violation of 21 U.S.C. § 844(a). Both Grier and Harper were sentenced to a total of four years' imprisonment followed by four years' probation. The jury found Grier and Harper *not guilty* of possession of cocaine with intent to distribute.

---

**6.** A DEA agent qualified as an expert in drug trafficking testified that he would not routinely expect to see as much as an ounce of cocaine in the hands of an ultimate consumer.

**7.** The presence of cocaine was confirmed by tests performed by a DEA chemist who testified at trial.

**8.** Both a DEA agent and Pipito Jr. testified that an "eight Ball" was a term used in the drug trade to refer to an eighth of an ounce of cocaine.

**9.** This was the number, listed in Louise Harper's name, for the Harper residence at which the search that was described previously occurred.

## II. ISSUES PRESENTED

Grier and Harper's appeal of their conspiracy and use of a communication facility convictions and Harper's appeal of his possession of cocaine conviction challenge the jury's verdicts on the following grounds: (1) that the district court committed reversible error in denying Grier's motion to compel production of various materials applicable to the operation of the pen register; (2) that the evidence was insufficient to convict either defendant of participation in a single conspiracy with Pipito and others, to convict either defendant of use of a communication facility in furtherance of the conspiracy and to convict Harper of possession of cocaine; (3) that the district court erred in failing to instruct the jury concerning multiple conspiracies; and (4) that evidence obtained from the search of Harper's residence should have been suppressed as the fruits of a search illegal under 18 U.S.C. § 3109.

## III. THE PEN REGISTER

### A. The Motion to Compel Production

Grier filed a motion at 4:28 p.m. on Thursday, September 11, 1986, requesting the district court to compel the production of materials relevant to the operation of the pen register device used to identify the telephone numbers in the wire tap. As indicated previously, during the period between October 25, 1984, and October 29, 1984, the pen register malfunctioned and failed to record the telephone numbers of the outgoing telephone calls. When the trial commenced on Monday, September 15,

the trial judge denied the motion to compel production, stating simply: "Defendant Grier has moved to compel the Government to provide information regarding the pen register in this case, and that motion is denied." [10] Grier relied on Rule 16(a)(1)(C) and (D), Fed.R.Crim.P.,[11] in moving to compel production of the following materials relevant to the operation of the pen register:

(1) The manufacturer, descriptive name and model number of each pen register or similar device used in the investigation of this case.

(2) Records of modifications, maintenance, calibration or testing done on each pen register or similar device used in the investigation of this case.

(3) Computer programs, other program documentation, user manuals and testing or debugging routines for all programs used to identify telephone numbers called during the investigation of this case.

(4) A description, including any written system manuals or other documentation, discussing the interplay between number dialed, identification procedures and conference call, call waiting, call forwarding and speed dialing procedures.

Grier contends the denial of his motion is reversible error because access to this information is provided under Rule 16, Fed. R.Crim.P., and any restriction of the discovery provided therein is a limitation of the defendant's right to confrontation of witnesses guaranteed by the sixth amendment to the United States Constitution.[12]

---

**10.** Harper attempts to join Grier's appeal of this issue even though he did not individually file a motion to compel. Apparently, Harper relies on his pre-trial motion to join all previously filed and future motions; however, such reliance is misplaced because the district court denied Harper's motion, stating: "Defendant Harper's motion to join all previously filed motions and future motions is of course denied." Harper does not appeal the ruling denying the joining of the motions, and Harper's appellate reply brief does not take issue with the government's contention that "defendant Harper is precluded from raising this issue on appeal." Nonetheless, because we affirm the district court's denial of Grier's motion, it is unnecessary for us to reach the question of whether

Harper joined in the motion to compel production.

**11.** Rule 16, Fed.R.Crim.P., generally concerns pre-trial discovery and inspections in criminal cases. Subsection (a) is entitled "Disclosure of Evidence by the Government" and paragraph (1)(A) is entitled "Information Subject to Disclosure." Subparagraphs (C) and (D), respectively, provide for disclosure of documents and tangible objects and reports of examinations and tests.

**12.** The National Association of Criminal Defense Lawyers has filed an *amicus curiae* brief supporting Grier's position, and both Grier and Harper adopt the arguments made therein. The

Moreover, Grier argues that the government's reliance on any privilege not to disclose *sensitive* investigative techniques is misplaced when applied to pen registers because pen registers are not "sensitive investigative techniques." Further Grier points out that he filed this motion only after informal attempts at discovery had failed and that the affidavit of his consulting expert attached to the motion stated that the information requested was necessary to identify technical weaknesses or areas of uncertainty concerning the accuracy of the pen register.[13]

Grier's counsel was appointed on May 14, 1986, approximately four months before the trial commenced. Grier's counsel made a series of letter requests for information from the government, commencing with a letter dated July 28, 1986, wherein he made a request for certain information, including

"[t]he manufacturer, descriptive name, and model number of each device used in the investigation of this case to intercept and record conversations or telephone calls or to identify the [sic] telephone lines to which or from which telephone calls were made, including but not limited to ... pen registers."

The July 28 letter also requested "[r]ecords of modifications, maintenance, calibration or testing done on each device identified ... which was used in the investigation of this case." In a letter dated August 7, 1986, the government responded to these requests confirming that

"the telephone numbers on incoming and outgoing calls from the Pipito telephone were identified by means of pen register, a trap and trace, and telephone toll records.

\* \* \* \* \* \*

You are entitled to examine these records, and draw your own conclusions

therefrom. If you find no record of a given telephone call, you will have probably determined that the government cannot identify the telephone number from which or to which the transcribed call was made. However, it is for you to draw that conclusion."

Additionally,

"you can listen to all of the wire taps in this case to determine whether or not anyone else named 'Chuck' or 'Charles' participated in any conversations that were intercepted ... if you wish to determine whether any conversations were recorded in the Pipito apartment during the period of time in which we believe your client [Grier] was present, you can listen to the tapes for that period of time, and make the determination yourself."

Subsequent to further communications between Grier's counsel and the government, the government delivered a letter on September 5, 1986, stating:

"With respect to item 2, the government used Revox reel-to-reel tape recorders to record the conversations. If you make an appointment with Special Agent Evanego, I am certain he will show them to you. However, with respect to all questions directed at the pen register or pen registers utilized in this case, the government declines to answer your inquiry based upon, among other things, the grounds set forth in *United States v. Van Horn*, 789 F.2d 1492, 1507–08 (11th Cir.1986).[14]"

Grier finally filed a motion to compel production of the pen register on Thursday, September 11, 1986, at 4:28 p.m. (one full business day before the trial was scheduled to commence).

### B. Confrontation Clause

█ Grier argues that the district court violated his rights under the confrontation

---

cases cited in this brief are discussed in Section III–B, *infra.*

**13.** Since the pen register identifies telephone numbers called from a telephone on location, information concerning the pen register's technical operation is ultimately useful for the purpose of challenging the identification of Grier as a party to particular recorded conversations.

**14.** *United States v. Van Horn,* 789 F.2d 1492, 1507 (11th Cir.1986) recognized a "qualified governmental privilege not to disclose sensitive investigative techniques." In that case the government was permitted to withhold information concerning the nature and location of electronic surveillance equipment.

clause when it denied his motion to compel production. However, we note that "[t]here is no general constitutional right to discovery in a criminal case...." *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977) (quoted in *United States v. Napue,* 834 F.2d 1311, 1316 (7th Cir.1987)).[15] The absence of such a right is confirmed by Federal Rule of Criminal Procedure 16(d)(2) which permits district courts discretion in issuing orders compelling discovery by merely providing that a court *may* issue such orders. *See United States v. Basta-nipour,* 697 F.2d 170, 175 (7th Cir.1982). As we stated in *Bastanipour:*

> "Discovery matters are committed to the sound discretion of the district court and an error in administering the discovery rules is reversible only on a showing that the error was prejudicial to the substantive rights of the defendant."

697 F.2d at 175 (quoting *United States v. Barnes,* 634 F.2d 387, 390 (8th Cir.1980) and *United States v. Pelton,* 578 F.2d 701, 707 (8th Cir.1978)).

Grier contends that disclosure of information concerning the pen register is necessary for Grier to vindicate his "right to confront the witnesses against him" under the sixth amendment. As detailed more fully below, Grier had ample opportunity to cross-examine the witnesses against him. The Supreme Court has determined that:

> "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' *Davis v. Alaska,* 415 U.S. [308] at 318 [94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)]."

*Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). In *United States v. Cameron,* 814

F.2d 403, 406 (7th Cir.1987), we recently emphasized that the confrontation clause does not provide an unlimited cross-examination right:

> "The Sixth Amendment provides a criminal defendant the right to cross-examine the prosecution's witnesses. However, this right is not unlimited. Trial judges have broad discretion 'to impose reasonable limits on such cross-examination based on concerns about ... harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginal relevant.' *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). In order to determine whether the restrictions placed on the right to cross-examine a witness rise to the level of a constitutional deprivation, we 'look to the record as a whole ... and to the alternative means open to impeach the witness.' *United States ex rel. Blackwell v. Franzen,* 688 F.2d 496, 500–501 (7th Cir.1982), *cert. denied,* 460 U.S. 1072, 103 S.Ct. 1529, 75 L.Ed.2d 950 (1983) (citations omitted). We must resolve whether the restrictions that the court imposed on the defendant's cross-examination deprived the defense of a meaningful opportunity to elicit available, relevant information that was likely to impeach the credibility of the witness."

(Citation omitted). Thus, in order that we might determine whether the denial of Grier's discovery request impeded his sixth amendment rights, we must examine the record to ascertain if Grier, in fact, was prevented from conducting meaningful cross-examination.

■ After examining the record we are convinced that Grier had more than an "ample opportunity" to question the pen register's accuracy and that the "defense made use of its opportunity" as did the defense in *Cameron,* 814 F.2d at 406. Grier was allowed to engage in a thorough and relatively unimpeded cross-examination of these FBI agents on the question of the details of the operation of the pen register.

---

**15.** In *United States v. Napue,* we held that neither the defendant's sixth amendment rights nor Rule 16, Fed.R.Crim.P., required that he be pro-

vided with a list of all prospective government witnesses before trial in non-capital cases. 834 F.2d at 1317.

Furthermore, we observe that Grier's counsel exhibited sufficient familiarity with the pen register device to permit him to conduct a thorough cross-examination of the government's witnesses on this subject. As we have upheld reasonable and logical restrictions of cross-examination on entire subject areas under the confrontation clause,[16] we conclude that the confrontation clause was not violated in this case in which an effective and largely unrestricted cross-examination was permitted concerning the subject of the technical operation of the pen register.

The cases cited by Grier and the amicus fail to support Grier's confrontation clause claim. *United States v. Liebert,* 519 F.2d 542 (3d Cir.1975), was a case in which a court provided a criminal defendant with pretrial discovery of technical information pertaining to the operation of an Internal Revenue Service computer utilized in compiling lists of taxpayers who failed to file income tax returns. Grier's contention is that the rationale of the *Liebert* case should require that Grier be given access to technical information concerning the operation of the pen register used in this case. However, in *Liebert* information concerning the computer's technical operation was furnished as an alternative to the court's denial of access to the computer's output, a list of non-filing taxpayers. In this case the government provided Grier with the analogs to the computer output denied the defendant in *Liebert* when it allowed Grier to have access to information concerning the pen register's identification and non-identification of phone numbers in specific recorded telephone conversations and to the tapes of each of these recorded conversations. Information concerning the pen register's technical operation is relevant to Grier's case only insofar as it bears upon the question of whether Grier was a party to any of these recorded conversations.

Because Grier's cross-examination of the government's witnesses on this issue was thorough and informed, we believe that this examination proceeded just as effectively with the information Grier received as it would have proceeded if Grier had received the information concerning the device's technical operation which was received by the defendant in *Liebert.*

*United States v. Kelly,* 420 F.2d 26 (2d Cir.1969), cited by Grier and the amicus, provides little support for Grier's position. *Kelly* involved the question of whether the government was required to provide a criminal defendant with pre-trial notice that it had conducted a "neutron activation" test on certain drugs and with the results of the test it conducted.[17] The court concluded that notice of the test and access to the test results was proper discovery material in that particular factual situation. In this case, prior to trial, Grier was advised by the government that a pen register was used, he was given access to the telephone numbers the pen register recorded, and was also told the dates on which the pen register was inoperative. Grier's receipt of this information is the equivalent of the notice of the test and access to test results furnished in *Kelly.* Accordingly, Grier has received all the information to which *Kelly* would entitle him.[18] Thus, for the reasons enumerated above, neither *Kelly* nor *Liebert* requires a conclusion contrary to our determination that Grier's thorough and meaningful cross-examination of the government's witnesses on the issue of the pen register's technical operation and accuracy satisfied the requirements of the sixth amendment's confrontation clause.

### C. Federal Rule of Criminal Procedure 16

■ Grier also alleges that the court's denial of his motion to compel discovery

---

**16.** *See Cameron,* 814 F.2d at 406 (permitting trial court restriction on cross-examination concerning witness's character).

**17.** The "neutron activation" test is a means used to determine whether particular drugs came from the same original batch. *See Kelly,* 420 F.2d at 28, 29.

**18.** *Kelly* was decided under Federal Rules of Criminal Procedure standards rather than under the constitutional confrontation clause standards. Thus, *Kelly* is not authority for the proposition that Grier was denied his rights under the confrontation clause.

violated his rights under Federal Rule of Criminal Procedure 16. In reviewing this argument, we again note that this determination is "committed to the sound discretion of the district court and an error in [such a determination] is reversible only on a showing that the error was prejudicial to the substantive rights of the defendant." *Bastanipour*, 697 F.2d at 175 (quoting *United States v. Barnes*, 634 F.2d 387, 390 (8th Cir.1980), and *United States v. Pelton*, 578 F.2d 701, 707 (8th Cir.1978)). Even if we were to agree that the material Grier requests is discoverable under the rules, it is clear, for the reasons set forth, that the district court acted within the limits of its sound discretion in confining the disclosure in this case. We note that Grier's motion to compel extensive discovery was received only one full court day before the commencement of trial. Granting Grier's request could very probably have delayed the trial's commencement because Grier would in all probability have requested time to review the desired material. In light of the significant demands this discovery request placed on the government and the extremely limited period of time the government would have had to comply with the discovery request, we conclude that the district court's exercise of its discretion in refusing to compel disclosure of the requested material was proper.[19]

### D. Harmless Error/Prejudice to Substantive Rights

#### 1. *Relevant Legal Standards*

As we have previously determined, the Constitution and the Federal Rules of Criminal Procedure do not provide grounds for reversing the district court's refusal to compel discovery in this case. Further, as in most criminal cases, an alleged infringement of constitutional rights would be subject to harmless error analysis,[20] while any claim of interference with discovery rights under the federal rules

resulting from denial of information concerning the pen register would be subject to a showing that the error did not "prejudice the substantive rights of the defendant." *See United States v. Bastanipour*, 697 F.2d 170, 175 (7th Cir.1982). These standards set forth in case law recite that minor errors, which do not affect the fairness of a trial, cannot serve as a basis for overturning a conviction. As the Supreme Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). In *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), the Supreme Court explained the harmless error standard in the following fashion:

> "[W]e have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. *E.g. United States v. Hasting* [461 U.S. 499, 508–09 [103 S.Ct. 1974, 1980–81, 76 L.Ed.2d 96] (1983)] ... (improper comment on defendant's silence at trial); *Moore v. Illinois*, 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977) (admission of identification obtained in violation of right to counsel); *Harrington v. California* [395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969)] ... (admission of non-testifying co-defendant's statement). The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, *United States v. Nobles*, 422 U.S. 225, 230, 95 S.Ct. 2160, 2166, 45 L.Ed.2d 141 (1975), and promotes public respect for the criminal process by focusing on the underlying fair-

---

**19.** *United States v. Kelly*, 420 F.2d 26 (2d Cir. 1969) also cannot be stretched to support Grier's Rule 16 argument because, unlike *Kelly*, there is no dispute that Grier was aware of the government's use of a pen register and the results of the pen register monitoring.

**20.** *See Delaware v. Van Arsdall*, 475 U.S. 673, 681–82, 106 S.Ct. 1431, 1436–37, 89 L.Ed.2d 674 (1986).

ness of the trial rather than on the virtually inevitable presence of immaterial error. [citations omitted]."

The "substantive rights" or "substantial rights" standard this court utilized in *United States v. Bastanipour*, 697 F.2d 170, 175 (7th Cir.1982), stems from Federal Rule of Criminal Procedure 52(a) which states that: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Unlike the harmless error standard, the government is not required to demonstrate that the error was harmless beyond a reasonable doubt. Rather, the government must establish only that the error had no "substantial influence on the verdict." *United States v. Kotteakos*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). The Supreme Court in *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1247–48, explained the standard in the following manner:

"If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phrase affected by the error. It is rather, even so, whether the error itself had substantial influence."

(Footnote and citation omitted).

### 2. Application of the Standards to this Case

■ Application of either the harmless error or substantive rights standard to the facts of this case will necessarily lead to the conclusion that any technical interference with Grier's rights present here fails to rise to the level of prejudice requiring a reversal of the district court's refusal to compel discovery. As mentioned previously, the ultimate concern in this case is with Grier's access to information relevant to the identification of Grier or his wife Beverly as a speaker in two conversations in which the pen register allegedly was not properly operating. However, means of identification of Grier and/or his wife as a party to these conversations other than the pen register were available.

Identification of Grier and his wife as parties to the disputed telephone conversations was derived from a number of different evidentiary sources. Grier's voice was positively identified on a number of tapes by FBI agents, Perry Evanego and David Roden, who compared Grier's voice characteristics on those tapes to the voice characteristics heard in an in-person conversation with Grier. These agents testified at trial regarding their identification and were subject to cross-examination. The jury had all of the tapes available to it. Thus, the jury was able to compare the voices in the taped conversations in which pen-register-based identification was unavailable with the voices in taped conversations in which direct identification of Grier's voice had been made by FBI agents. From this information and its determination regarding the credibility and reliability of the government witnesses, the jury could ascertain that Grier was a party to the conversations in which the pen register failed to operate.

In addition to the direct identification evidence just considered, the record also presented very convincing circumstantial evidence identifying both Grier and his wife as parties to these conversations. We have previously recognized that circumstantial evidence oftentimes does aid in providing a basis for identification of recorded voices. *Cf. United States v. Vega*, 860 F.2d at 792 ("Based upon the totality of the circumstances, including Mrs. Vega's self-identification, Jesus Zambrana's obvious recognition of Mrs. Vega's voice, her specific reference to events discussed by her husband in a preceding phone call, as well as the timing of her call, an identification of Mrs. Vega's voice on the tape was clearly appropriate"); *United States v. Puerta Restrepo*, 814 F.2d 1236, 1239 (7th Cir.

1987) ("The authentication may be established by circumstantial evidence such as the similarity between what was discussed by the speakers and what each subsequently did").

In this case the circumstantial evidence most certainly aids in identifying Grier and his wife as parties to the two conversations with Pipito in which the pen register was inoperative. The two calls in question took place later on the same day (October 29, 1984) as a call in which the identification of Grier as a party to the conversation is undisputed.[21] In this call, Grier telephoned Pipito and asked if Pipito was "gonna be free anytime soon?" After a "call-waiting" interruption, Pipito stated that he was "tied up between now and about 2." Pipito said that he would get hold of Grier "at 2 o'clock." The first disputed call was recorded at 2:18 p.m. on the afternoon of that same day. As noted above, Grier and Pipito had planned another phone call around 2 p.m. The time of the phone call, when analyzed with other items of circumstantial evidence, identifies Grier as a party to this call. For example, Pipito recognized the voice of Grier's wife "Beverly" and identified her by name as "Bev." The evidence of Grier's involvement in this phone call becomes even more convincing when Pipito asked for "Chuck," Grier's name. Pipito then said that he would be "tied up 'til about 4:30." Pipito stated that he would "stop over" then. Pipito asked if he should "bring about two of those?" Grier responded that Pipito should "bring me a couple 'a beers, yeah." Grier's use of his own characteristic "code language" of "beers" to describe cocaine further confirms his involvement in this conversation. Thus, even in the absence of direct voice identification, it is clear that this first disputed conversation was between Pipito, Grier and Grier's wife Beverly because the time of day of the conversation was planned earlier that same day during Pipito and Grier's conversation, Pipito clearly identified Grier and his wife by name, and

Grier's use of his characteristic "code language" of "beers" to describe the cocaine Pipito was expected to deliver to Grier's residence.

The second disputed conversation also resulted from the preceding conversations between Grier and Pipito. This conversation took place at 4:17 p.m. on the same afternoon. This time was shortly before the time of the meeting between Pipito and Grier which they had planned in the 2:18 p.m. phone conversation just discussed. In this conversation Pipito and Beverly Grier once again identified one another by name, thus confirming their respective participation. Any doubt concerning the identity of the callers which might have existed was erased when Pipito asked Beverly Grier whether the numbers "224" and "605" were correct.[22] The conclusion that this call was made to Grier's household becomes even more convincing when considering the fact that Pipito also told Beverly Grier to tell "Chuck" (Charles Grier) that he was leaving right now. In the phone call that took place at 2:18 p.m. that same afternoon, Pipito and Grier had arranged to meet at a time within minutes of this 4:17 p.m. phone call. Once again, the clear familiarity of the parties with the facts revealed in earlier conversations, their mutual identification of one another's voices, their actions pursuant to their earlier plans, and the designation of the meeting place with numbers referring to Grier's address and apartment number, leave little doubt that the second conversation was also between Pipito and Charles and Beverly Grier.

Any possible doubt that might exist at this point is removed by the November 2, 1984, call from Pipito to Grier. In this call the two FBI agents identified Grier's voice through a comparison of Grier's voice characteristics in the recorded conversation to voice characteristics the agents observed and recollected from an in-person contact and conversation with Grier. In addition,

---

21. As indicated previously, identification of the location of the originating party of an incoming call was made through the trap and trace procedure.

22. It was undisputed at trial that Grier's address was 2224 West Wisconsin Avenue, Apartment 605, Milwaukee, Wisconsin.

this call was one in which Grier's telephone number was "identified" by the pen register. During this conversation, Grier left no doubt that he had been a party to the earlier phone calls by again utilizing his usual code words of "a couple of beers." As we stated in *Vega*, 860 F.2d at 795: "[C]ode words [are] always used by drug conspirators when they realize, as they do in today's drug culture, that their telephone conversations are frequently intercepted." It also stands to reason that an experienced party in drug transactions will make use of the same code language to describe particular drugs in order that his supplier may be sure of the party he is dealing with. The parties' mutual identification, the timing of the phone calls, the similar content of the phone messages, the identification of Grier's address in one of the calls, the consistent use of Grier's "beers" code language, and the clear similarity of the "code language" in the disputed calls to the language in calls in which Grier's voice was positively identified by two FBI agents following an opportunity to hear Grier in person, all mandate the conclusion beyond doubt that the two disputed telephone calls were between Pipito and the Grier household. The technical information Grier sought concerning the operation and accuracy of the pen register involved was material only to the question of whether Grier and/or his wife were properly identified as parties to the telephone conversations. Because there was clear evidence, independent of pen register data, identifying both Grier and his wife as parties to the conversations during the time the pen register was inoperative, the district court's denial of discovery to compel the release of information relevant to the technical operation of the pen register was proper, harmless beyond a reasonable doubt and did not substantially influence the jury's verdict.[23]

## IV. INSUFFICIENCY OF THE EVIDENCE

Next we turn to Grier and Harper's arguments that the evidence was insufficient to convict them of participation in a single, overall conspiracy to distribute cocaine,[24] to convict them of utilization of a communication facility and to convict Harper of possession of cocaine.

Both Grier and Harper challenge the jury's determination that they were involved in a single, overall conspiracy, alleging that the evidence was insufficient to convict. They contend that the evidence, at best, demonstrated that they were merely drug users who purchased drugs from Pipito.

Since Grier and Harper were found guilty of the conspiracy charges, individually they "bear a heavy burden" in overturning the verdict on appeal.[25] "An appellate court must uphold a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)." *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986). As this court stated in *United States v. Vega*, 860 F.2d at 793:

> both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

23. Having determined that Grier failed to state a constitutional claim or a claim under the Federal Rules of Criminal Procedure and, that, even if such claims existed, any errors would have either been "harmless" or "not have prejudiced Grier's substantive rights," we need not address the propriety of the government's reliance on a privilege not to disclose a sensitive investigative technique pursuant to the rationale of *United States v. Van Horn*, 789 F.2d 1492 (11th Cir. 1986).

24. 21 U.S.C. § 846 states:
"Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or

25. *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988). Neither Harper nor Grier alleged that the district court's denial of the pretrial motion for severance constitutes reversible error. However, they do contend that in the event we order a new trial, their respective trials should be severed from one another. We need not reach this issue as we affirm their convictions.

"As we emphasized in *United States v. Giangrosso*, 779 F.2d 376, 382 (7th Cir. 1985): '[T]his court is not the trier of fact and we are required to uphold the jury's verdict where "any rational trier of fact" could have found the defendant guilty of the crime.' Most importantly for this case: 'Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' *Nesbitt*, 852 F.2d at 1509 (quoting *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.), *cert. denied* [—— U.S. ——], 108 S.Ct. 1738 [100 L.Ed.2d 202] (1987) which quoted, in turn, *United States v. Moore*, 764 F.2d 476, 478 (7th Cir.1985))."

(Emphasis in original). "This [evidentiary standard] includes, in conspiracy cases, circumstantial as well as direct evidence." *United States v. Williams*, 858 F.2d 1218, 1221 (7th Cir.1988).

In *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969), this court explained the various elements that establish a single conspiracy:

"Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small number of co-conspirators, other parties who knowingly participate with these co-conspirators and others to achieve a common goal may be members of an overall conspiracy.

In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy."

"Of course, direct evidence of that agreement need not be shown, 'an agreement can be inferred from the circumstances.'" *United States v. Muskovsky*, 863 F.2d 1319, 1324 (7th Cir.1988) (quoting *United States v. Neapolitan*, 791 F.2d 489, 501 (7th Cir.1986)). "Because conspiracies are carried out in secret, direct proof of agreement is rare." *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988) (citations omitted).

"Not only is the use of circumstantial evidence permissible, but 'circumstantial evidence "may be the sole support for a conviction." ' " *United States v. Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir. 1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). " 'Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable.' " *Williams*, 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir. 1974)). *See also Wisconsin Jury Instruction—Criminal, No. 170* ("[C]ircumstantial evidence may be stronger and more convincing that direct evidence"). "[T]he evidence ' "need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." ' *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley*, 707 F.2d 622 (1st Cir.1983))." *Koenig*, 856 F.2d at 854.

In our review of the jury's verdict, we recognize that:

"Juries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See* [*United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986)]. While '[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.*"

*Nesbitt*, 852 F.2d at 1511. In addition: "[W]e defer to the jury's determination of witnesses' credibility. As we noted in *United States v. Ramirez*, 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well-settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound

discretion of the trier of fact." ' *United States v. Perry,* 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman,* 728 F.2d 846, 856 (7th Cir.1984)). Finally, 'the credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances.' *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.1985)."

*Vega,* 860 F.2d at 794.

■ "Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict." *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.1983). To convict a defendant of participation in a single conspiracy with other defendants, it is sufficient if it is established that:

> "[t]he parties to the agreement were aware that others were participating in the scheme. The co-conspirators must have 'knowingly embraced a common criminal objective.' *United States v. Ras,* 713 F.2d 311, 314 (7th Cir.1983). However, there is no requirement that the participants in the plan 'personally know the individuals involved ... [a]s long as the conspiracy continues and its goal is to achieve a common objective.' *United States v. Noble,* 754 F.2d 1324, 1329 (7th Cir.), *cert. denied,* [474] U.S. [818], 106 S.Ct. 63, 88 L.Ed.2d 51 (1985) (citation omitted)."

*United States v. Boucher,* 796 F.2d 972, 975 (7th Cir.1986). Further, this court has held that " 'if each [defendant retailer] knew, *or had reason to know,* that other retailers were involved with the ... [drug kingpin's] organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the jury *could find* that each had, in effect, agreed to participate in the overall scheme.' *United States v. Baxter,* 492 F.2d 150, 158 (9th Cir.1973) (emphasis added)." *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985). In other words, "[if] the facts indicate that the defendant must have known something ... then a jury may be able to find beyond a reasonable doubt that he did know it, especially since the requirement of knowledge is satisfied by proof that the defendant wilfully shut his eyes for fear of what he might see if he opened them, *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.1985)." *Cerro,* 775 F.2d at 911.

Applying these standards of proof to Grier and Harper, there is little question that a rational jury could and did determine beyond a reasonable doubt that each defendant was a part of the single conspiracy to distribute cocaine.

### A. Existence of a Single Conspiracy to Distribute Cocaine

■ With respect to the question of whether a conspiracy existed, the evidence clearly establishes that there was a conspiracy, with Anthony Pipito, Sr. as the kingpin, which included, but was not limited to, Pipito's girlfriend Gail Schill, his son Anthony Pipito, Jr., and others. Anthony Pipito, Jr. testified extensively at trial concerning his knowledge of the cocaine distribution business including information about two Columbians based in Florida, about trips Pipito took to Florida to procure cocaine, and about the quantity of cocaine sold. More specifically, Pipito, Jr. testified that he took orders for cocaine, counted money and took money to a safety deposit box all on his father's behalf. He also testified that, on occasion, he tested the purity of the cocaine by melting a sample of the drug together with oil and gauging its temperature on a celsius thermometer. Further, he testified that Schill was involved in the cocaine business and helped deliver cocaine to other individuals. More importantly, the November 30, 1984, search of Pipito's residence and his basement storage locker revealed cocaine and a substance used to dilute ("cut") cocaine before its ultimate sale. The cocaine found weighed 2,636.81 grams (approximately 5¾ pounds), was packaged in several separate bags, and was varying in purity from 72 to 90 percent. Simply stated, there was over-

whelming evidence of the existence of a single conspiracy to distribute cocaine with Pipito as the boss. Both Grier and Harper contend, however, that the evidence was insufficient for a reasonable jury to determine that they were members of this single conspiracy. We analyze whether the evidence was sufficient to convict Grier and Harper, respectively, of being members of a single conspiracy.

### B. Grier's Participation in the Single Conspiracy

■ Grier contends on appeal that the evidence adduced at trial failed to establish anything more than that the co-defendants in this case were "consumers competing for a scarce commodity in a seller's market" and that there was not even a "hint" that Grier had an interest in, or knowledge of, anything Pipito may have been doing in addition to selling him cocaine. Moreover, Grier argues that none of the evidence relating to the co-defendants or other co-conspirators establishes that Grier had an interest in, or knowledge of, their activities. Thus, Grier argues on appeal that he was merely a customer of Pipito rather than a full-fledged member of Pipito's conspiracy. We disagree.

The contents of the 12 intercepted phone calls between Grier or his wife with Pipito over a one-month period clearly demonstrate Grier's knowing participation in an ongoing Milwaukee, Wisconsin, drug conspiracy which included kingpin Anthony Pipito, Sr., and others. The October 29, 1984, conversations between Grier, his wife, and Pipito demonstrate a direct relationship close enough to have Pipito personally deliver drugs to Grier at Grier's apartment. Grier's clear involvement in the single overall conspiracy is further confirmed by Schill's November 25, 1984, conversation with Pipito. Schill asked Pipito, "Did you front anybody else's stuff?" Later in the same call Schill asked, "Anybody else got the stuff?" And the conversation continued:

"PIPITO: Yes. Other people got their stuff.

SCHILL: I wanted an ... like on my side.

PIPITO: No, no, no. No. Ah, just ...

SCHILL: No niggers?

PIPITO: Chuck.

SCHILL: Chuck, O.K." [26]

The record also reflects that Grier also knew facts which would reasonably lead him to an awareness of Pipito's involvement with others in drug conspiracy activities. Grier knew that Pipito went to Florida in November 1984 as evidenced by the fact that Grier phoned Pipito the day after his return and asked him "How was your trip?" He also told Pipito in that conversation that he was "thirsty as hell" and "could use about four beers" to which Pipito said, "Good." This was obviously a "code word" message requesting Pipito to deliver to Grier some of the drugs Pipito obtained. The jury could permissibly infer that Grier knew that Pipito was going to Florida to purchase drugs and could very logically infer from this and other factual circumstances that Grier knew he was participating in a larger drug enterprise. It was certainly logical and reasonable for the jury to conclude, based upon Pipito's Florida trips and his knowledge that Pipito used a "beeper" for messages (a fact reflective of a broad conspiracy), that he was part of a drug conspiracy which extended well beyond Pipito and himself. As the Supreme Court stated in *Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947):

"[T]he salesmen knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and ob-

---

**26.** The fact that Grier and Pipito's relationship was more than that of just a seller and user is also confirmed by the search of Grier's residence which resulted in the seizure of a "dial-o-gram" scale. A DEA expert testified that drug traffickers use the dial-o-gram type scale to package drugs because that type of scale "lends itself more readily to somewhat larger quantities than smaller quantities."

ject of all. By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal."

### C. Harper's Participation in a Single Conspiracy

■ Harper contends, as does Grier, that the evidence does not establish a single "wheel conspiracy" and argues that there is no evidence linking Harper to any of the other defendants. According to Harper the evidence, at best, "showed Pipito had his own little conspiracy with Harper and with each co-defendant." However, as we made clear in our discussion of the Grier evidence, there is sufficient evidence to convict one of a single conspiracy if the evidence establishes that the individual is aware of the "essential features and broad scope" of the conspiracy and that the co-conspirators are united in a "common single goal." *Blumenthal,* 332 U.S. at 558, 68 S.Ct. at 257. The individual co-conspirator need not know the other parties involved in the conspiracy, he must only know that other people are involved. *Boucher,* 796 F.2d at 975.

■ The evidence at trial established that Harper was more than an occasional purchaser of drugs for personal use. The government introduced eight recordings of intercepted phone conversations between Harper and/or his wife and Pipito. In one of these conversations (on November 6, 1984) the following dialogue occurred:

"HARPER: So I really don't want to keep you on hold, you know. *Things are slow, but fuck it, it don't make no difference, you know.*

PIPITO: Uh, hm.

HARPER: O.K.?

PIPITO: All right, you want me to bring anything, or.

HARPER: Just one, you know.

PIPITO: All right."

(Emphasis added). Later that same day Pipito phoned the Harper residence and talked to Mrs. (Louise) Harper. Pipito said he had "something comin' in Friday" and that he wanted to speak with Harper about it.

On November 26, 1984, Pipito, after his return from Florida, again called Harper and told him that he had been trying to get hold of him all day Saturday (November 24). Harper said that he was "starvin' to death" and it was agreed that Pipito would bring "a couple of things to show" Harper so he could decide. During the conversation Harper expressed his concern that Pipito had not contacted him sooner because Pipito was "supposed to contact [him] the time you got *it* back." (Emphasis added). Later that same morning defendant Harper called Pipito and it was agreed that Harper would call Pipito later so that they could work out some kind of a plan. That afternoon Harper called Pipito to tell him that he was home, and Pipito replied that he was on his way.

Harper's status as more than an occasional purchaser of drugs was confirmed by the search of Harper's residence on the evening of November 30, 1984. The "Country Time" lemonade can was seized, and a DEA chemist testified that the white powdery substance found within double plastic bags in the lemonade can amounted to 35.46 grams (approximately one and one-quarter ounces) of 49 percent pure cocaine. A DEA agent qualified as an expert in the drug trafficking field testified that he would not expect to see as much as an ounce of cocaine in the hands of one individual consumer. Also found during the search was a scale and a plate, both of which had traces of cocaine upon them. In another area of the residence, a dial-o-gram scale was also found. The DEA expert testified that drug traffickers use dial-o-gram scales to package drugs because that type of scale "lends itself more readily to somewhat larger quantities than smaller quantities." Also discovered during the search were three revolvers, two of which were loaded and a piece of paper containing drug-related phrases.

■ Finally, a page of a notebook was found during the search of the co-defend-

ant Jackson's residence on which the name "Harper" was written followed by the phone number of the Isaac Harper residence. Both at trial and on appeal Harper argued that the note was inadmissible since it lacked relevance and was without probative value. The district court judge ruled, after legal argument outside the presence of the jury, that the note was admissible. His decision is reviewed under an abuse of discretion standard. *See, e.g., United States v. Davis,* 838 F.2d 909, 914 (7th Cir.1988). Federal Rule of Evidence 402 states that "[a]ll relevant evidence is admissible." " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Rule 401, Fed.R.Evid. It is undeniable that a note with Harper's name and phone number on it, found in the apartment of an alleged co-conspirator, is relevant evidence as it tends to make Harper's involvement in the conspiracy more probable than it would be in the absence of the evidence. *See id.* This case is not one like *United States v. Bentvena,* 319 F.2d 916, 949 (2d Cir.1963), in which the involved notebook page was the "sole independent evidence connecting the defendant with the conspiracy." The page from the notebook, while not alone sufficient to convict Harper of membership in the conspiracy, is also relevant evidence, albeit circumstantial, establishing that Harper was participating in the conspiracy and aware of its magnitude. As we noted, *supra,* at 923: "Not only is the use of circumstantial evidence permissible, but 'circumstantial evidence "may be the sole support for a conviction." ' " *Nesbitt,* 852 F.2d at 1510 (quoting *United States v. Williams,* 798 F.2d 1024, 1042 (7th Cir. 1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady,* 774 F.2d 868, 874 (8th Cir.1985)).

For the reasons detailed, based on the totality of the evidence introduced against Harper, a jury could and did find that Harper knowingly and willingly participated in a single conspiracy with others which had Pipito as its kingpin. The contents of the telephone calls between Harper and Pipito

demonstrate a close personal relationship with Pipito and a knowledge that Pipito was receiving drugs from others in what the jury could very logically infer was a large-scale drug distribution enterprise. The calls further reflected a knowing and expectant waiting for the delivery of drugs by others in the conspiracy. Moreover, the large amount of cocaine found in the search of Harper's residence, combined with the dial-o-gram scale, the scale and plate with cocaine traces, and loaded guns all point toward Harper's obvious personal involvement in the conspiracy. The addition of the piece of paper with Harper's name and phone number on it, which was found in the residence of another co-conspirator, further bolsters the finding of Harper's involvement in the conspiracy which flowed from the other pieces of evidence. Based on all this evidence the jury reasonably found that the common goal of the conspiracy in this case was to distribute cocaine for profit. A rational jury could and did infer, based on the evidence and its exercise of its collective common sense, that each co-conspirator, including Harper, was a knowledgeable and important member participating in a large-scale drug distribution enterprise, and we confirm that portion of the jury verdict convicting Harper of membership in a single conspiracy.

### D. Grier and Harper's Use of a Communication Facility

Both Grier and Harper argue that their convictions for using a communication facility (telephone) in violation of 21 U.S.C. § 843(b) to facilitate the conspiracy must be reversed due to the alleged insufficiency of evidence. Grier and Harper both argue that their convictions for use of a communication facility in committing, causing or facilitating a drug-related offense must be reversed as the evidence to support their conspiracy convictions is insufficient. We effectively disposed of this contention in the previous section of our opinion, as we held that the evidence was sufficient to establish Grier and Harper's guilt on conspiracy charges. Thus, Grier and Harper's convictions for use of a communication fa-

cility could be based upon their conspiracy convictions.

Harper goes on to argue that his conviction also must be reversed because the jury's finding of guilt on the charge of use of a communication facility in committing, causing or facilitating a drug-related offense was logically inconsistent with its finding that he was guilty of "simple" possession of cocaine.

Under 21 U.S.C. § 843(b) the government must prove a "(1) knowing or intentional (2) use of a telephone (3) to facilitate the commission of an offense." *United States v. Jefferson*, 714 F.2d 689, 699 (7th Cir.1983) (citations omitted). As we observed in *United States v. Alvarez*, 860 F.2d at 813:

"[T]he actual distribution of narcotics need not be perpetrated by the defendant charged with the crime of telephone facilitation. As the Fifth Circuit aptly summarized the crime of telephone facilitation under 21 U.S.C. § 843(b):

'In order to prove a violation of 21 U.S.C.A. § 843(b), the Government must establish that the defendant knowingly and intentionally used a communications facility, *e.g.*, a telephone, to facilitate the commission of a narcotics offense. In order to establish the facilitation element, the Government must show that the telephone call comes within the common meaning of facilitate—"to make easier" or less difficult, or to assist or aid. *It is sufficient if a defendant's use of a telephone to facilitate the possession or distribution of controlled substances facilitates either his own or another person's possession or distribution.*'

*United States v. Phillips*, 664 F.2d 971, 1032 (5th Cir. Unit B 1981) (emphasis supplied), *cert. denied*, 457 U.S. 1136 [102 S.Ct. 2965, 73 L.Ed.2d 1354] (1982); *see United States v. Watson*, 594 F.2d 1330, 1342 n. 14 (10th Cir.) (defendant could be charged with telephone facilitation if underlying distribution was by either himself or third party), *cert. denied*, 444 U.S. 840 [100 S.Ct. 78, 62 L.Ed. 2d 51] (1979)."

■ As noted previously, the jury found Harper guilty of conspiracy and "simple" possession of cocaine in addition to the use of a communication facility. The "simple" possession crime was a lesser-included offense of the crime of possession of cocaine with intent to distribute, on which the jury acquitted Harper. Harper alleges that the findings of guilt on the use of a communication facility charges are inconsistent with the finding of guilt for "simple" possession of cocaine. Harper somehow argues that his guilty verdict on the possession offense means that the jury impliedly found that Harper did not use the telephone to obtain cocaine with intent to distribute, a finding which Harper contends is inconsistent with his conviction of a use of a communication facility offense. Thus, he argues that the use of a communication facility convictions must be reversed. We disagree.

■ It is well settled that an alleged "inconsistency" between a jury's verdicts, if in fact one does exist, does not support reversal of a conviction in a criminal case. In the leading case on this issue, *United States v. Powell*, 469 U.S. 57, 69, 105 S.Ct. 471, 479, 83 L.Ed.2d 461 (1984), the Supreme Court held that inconsistent verdicts, even verdicts that acquit on an underlying offense while convicting on a compound offense, do not preclude a valid conviction. In such cases it is "possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on a lesser offense." *Powell*, 469 U.S. at 65, 105 S.Ct. at 476. As the Supreme Court emphasized in *Powell*, "A criminal defendant already is afforded protection against jury irrationality or error by the independent review of the sufficiency of evidence undertaken by the trial and appellate courts.... This review should be independent of the jury's determination that evidence on another count was insufficient." *Id.* at 67, 105 S.Ct. at 478. This resolution carries out the Supreme Court's earlier observation in *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190,

76 L.Ed. 356 (1932), that "[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it were a separate indictment." The deference accorded to the jury's verdict in *Powell* and *Dunn* stems not only from the jury's role as a "check against arbitrary or oppressive exercises of power by the Executive Branch," *Powell*, 469 U.S. at 65, 105 S.Ct. at 477, but also from the fact that "[c]ourts have always resisted inquiring into a jury's thought processes [and] through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality." *Id.* at 67, 105 S.Ct. at 478.

Harper attempts to circumvent the law in *Powell* by arguing that the inconsistency in the verdicts in his case was not created by an acquittal, but by a conviction of another crime. Although we have grave doubts as to whether Harper's proffered distinction possesses any legal significance in light of the policy of deference to the jury's function enunciated in *Powell*,[27] this alleged distinction is not applicable to this case. The inconsistency herein is not created by the fact that the jury *convicted* Harper of simple possession of the cocaine obtained in the November 30, 1984, search. This conviction, in and of itself, is not inconsistent with a finding that Harper, on November 6 and 8, 1984, utilized a communication facility in furtherance of the conspiracy and of the distribution of cocaine. As the government points out, Harper could very well have possessed cocaine other than that found in the November 30, 1984, search, which was obtained in the November 6 and 8, 1984, telephone calls and which he intended to distribute. Further, as previously discussed, there was a great deal of circumstantial evidence that Harper distributed, rather than simply used, cocaine. Rather, Harper's real contention is that the jury's verdict of *acquittal* of the crime of possession with intent to distribute cocaine was inconsistent with the use of a communication facility conviction. However, *Powell* clearly disposes of that claim by its

holding that a verdict of acquittal of an underlying offense will not prevent a verdict of conviction on a compound offense. Thus, because Harper's allegations of inconsistent verdicts provide absolutely no legal basis for reversal of his communication facility convictions, these convictions are affirmed.

### E. Harper's Possession of Cocaine

Harper also contends that the evidence was insufficient to convict him of possession of cocaine. Harper's conviction for possession of cocaine stems from the search of his condominium. An FBI agent who participated in the search and inventoried items seized during the search testified that upon entry Harper and a woman were sitting "on the couch." They were given a copy of the search warrant, and after being asked "Where he kept it or the cocaine," were "allowed ... to discuss[ ] the matter privately." Harper then went into the kitchen, took out a "Country Time" lemonade can and "handed it to the search agents." In the can were a number of double plastic bags containing a white powdery substance which a DEA chemist identified as totalling 35.46 grams (approximately one and one-quarter ounces) of 49 percent pure cocaine. Also found during the search were two scales, one with traces of cocaine on it, a "saucer or plate" with traces of cocaine on it, and a "rectangular green strip of paper."

At trial an FBI agent testified that, in addition to Harper, only "Mrs. Harper" was present when agents entered the condominium. While the condominium's telephone was in the name of "Louise Harper," the recorded conversations reflect that Harper used the telephone to speak with Pipito.

Harper argues, as he did in his closing argument, that the evidence is insufficient to prove that he possessed the cocaine found during the search beyond a reasonable doubt. He primarily relies on two cases, *United States v. Manzella*, 791 F.2d

---

27. *Powell*, however, did leave open the question of the "proper resolution of a situation where a defendant is convicted of two crimes, where a guilty verdict on one count *logically excludes* a finding of guilt on the other." 469 U.S. at 70 n. 8, 105 S.Ct. at 479 n. 8 (emphasis added).

1263 (7th Cir.1986) and *United States v. DiNovo*, 523 F.2d 197 (7th Cir.1975). Both cases are distinguishable from this case.

In *Manzella*, the evidence established that the defendant was a drug "broker"; that is, he brought willing buyers and willing sellers of drugs together. In that case we stated, "[t]here is no indication that Manzella had any control, individually or jointly, over the cocaine that he tried to obtain for ... [buyer]." *Manzella*, 791 F.2d at 1266–67. The same cannot be said in this factual situation, for herein *every fact establishes that the cocaine was, at the very least, under the joint control of Harper and his wife, if not under Harper's individual control.*

■ In order to demonstrate possession of cocaine, it is sufficient that the government show a level of control that meets the standard of "constructive possession." As we explained in *United States v. Moya–Gomez*, 860 F.2d 706, 756 (7th Cir.1988):

"The rule of constructive possession holds that 'a person can be convicted for possessing cocaine though he does not possess it in a literal sense.' *United States v. Manzella*, 791 F.2d 1263, 1266 (7th Cir.1986). 'To establish constructive possession of a controlled substance, the government must produce evidence demonstrating "ownership, dominion, or control over the contraband...."'" *United States v. Galiffa*, 734 F.2d 306, 316 (7th Cir.1984) (quoting *United States v. Ferg*, 504 F.2d 914, 916–17 (5th Cir.1974)); *see also United States v. Rodriguez*, 831 F.2d 162, 167 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1234 [99 L.Ed.2d 433] (1988); *United States v. Perlaza*, 818 F.2d 1354, 1360 (7th Cir.), *cert. denied*, [—— U.S. ——,] 108 S.Ct. 176 [98 L.Ed.2d 130 (1987); *Manzella*, 791 F.2d at 1266; *United States v. Shackleford*, 738 F.2d 776, 785 (7th Cir.1984); *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir.), *cert. denied*, 439 U.S. 958 [99 S.Ct. 361, 58 L.Ed.2d 351] (1978). 'Mere association with those who possess the drugs is not good enough.' *Manzella*, 791 F.2d at 1266. However, '[r]esidence in a house used as a drug distribution center, and evidence of direct access to and participation in the [drug] distribution on the day of [the defendant's] arrest,' *is* sufficient. *Galiffa*, 734 F.2d at 316."

(Emphasis in original).

■ Our standard accords with the traditional majority state court disposition of this issue which was discussed by the Wisconsin Supreme Court several years ago in *State v. Dodd*, 28 Wis.2d 643, 649–50, 137 N.W.2d 465, 468–69 (1965):

"Most jurisdictions which have considered the [question] have held actual physical possession of a narcotic is not necessary, it being sufficient if the defendant has constructive possession or is 'within such juxtaposition' to the narcotic as to justify a finding of possession.
The heroin was discovered in the house occupied solely by Dodd and his wife. The eyedropper with heroin in it was found in his bedroom within inches of his feet. Four tin foil packages which contained traces of heroin were found in the refuse container in the bathroom. No claim is made by Dodd that the heroin was not in his exclusive constructive control because his wife had as much control of the house as he did. Proof of joint possession has been held to support a conviction especially in husband-and-wife situations.
Dodd took the stand in his own behalf and suggested or inferred that the presence of the drug was due to the visit earlier that night of the two known drug addicts. But such testimony would not overcome the physical facts which gave rise to an inference of knowledge and constructive possession on the part of Dodd which under the circumstances was sufficient to establish the guilt of unlawful possession of heroin beyond a reasonable doubt. Although it is apparent Dodd did not use the heroin personally, the possession of a narcotic prohibited by the section is not restricted to possession for personal use."

(Citations omitted). Clearly, Harper's "direct access" and "control" over the involved cocaine established the constructive

possession necessary to meet the statutory standard.

The *DiNovo* case, on which Harper relies, is also distinguishable in light of the clear evidence of Harper's constructive possession of the cocaine present here. In *DiNovo* it was not clear where the drugs were located within the residence. The "Country Time" lemonade can in this case was in a common area of the residence—the kitchen, Harper knew where the can was and went directly to the can containing the drugs during the execution of the search warrant. These facts also support the jury's verdict because again, at the very least, they show that Harper and his wife had joint control and constructive possession of the drugs which was necessary for a finding of guilt.

Harper's speculative and self-serving argument that he was being "chivalrous" in delivering the drugs to the agent for his spouse while the agents were on the premises during the search and during this time that she might have told him where the cocaine was located is without a scintilla of support in this record. Even if Harper's "chivalry" hypothesis were a permissible construction of the facts, it would not preclude a finding of guilt because the evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke*, 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States v. Thornley*, 707 F.2d 622 (1st Cir.1983)). *See also United States v. Zanin*, 831 F.2d 740, 745 (7th Cir.1987) ("Phyllis Zanin argues that all conversations in which she participated are susceptible to an innocent explanation. This may or may not be true—but it is irrelevant. The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt").

The evidence clearly establishes Harper's access to and control of the involved cocaine. Since Harper had possession and control of the cocaine, the evidence is more than sufficient for a rational jury to have properly found "possession" beyond a reasonable doubt.

## V. LACK OF SINGLE CONSPIRACY INSTRUCTION

Grier and Harper both argue that the district court erred by instructing the jury concerning an "overall conspiracy" (a wheel conspiracy) without also instructing the jury concerning the possible existence of a number of multiple conspiracies between Pipito and each of the defendants.

 The defendants premised their multiple conspiracy instruction argument, in part, on an alleged variance between the proof adduced at trial (which they contend at best could establish a number of multiple conspiracies) and the single conspiracy alleged in Count I of the indictment. They argue that the existence of the variance prejudiced their substantial rights and requires reversal. We disagree. A variance occurs at trial only "when the terms of the indictment are unaltered but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Galiffa*, 734 F.2d 306, 312 (7th Cir.1984) (quoted in *United States v. Mosley*, 786 F.2d 1330, 1335 (7th Cir.1986)). As the Ninth Circuit stated under similar circumstances in *United States v. Perry*, 550 F.2d 524, 531 (9th Cir.1977):

"Because we have found, after a reading of the record in this case, that the jury could rationally conclude that there was one general conspiracy and that defendants were members of it, we find that there is no variance between the indictment and the proof adduced at trial which prejudiced defendants' rights."

(Citation omitted). On this record we have held earlier in this opinion that a rational factfinder could very properly find beyond a reasonable doubt that Harper and Grier were active participants in a single conspiracy. Thus, there was no variance between the proof adduced at trial and the single conspiracy alleged in the indictment.

This determination, however, does not end our inquiry into the necessity for a multiple conspiracy jury instruction, because Grier and Harper also contend that it was reversible error for the district court judge to deny a proposed jury instruction

offering the jury the option to find a number of smaller conspiracies as an alternative to finding a single conspiracy.

Initially, we note that Grier proposed such a multiple conspiracy instruction,[28] the district court refused to accept the instruction, and Grier entered a timely objection on the record to the denial. Harper, however, did not propose a multiple conspiracy instruction nor did he object on the record to the denial of Grier's proposed instruction. This procedural background is important because it impacts on our standard of review. Grier's individual objection on the record to the court's failure to give his jury instruction and statement of the reasons for his objection properly preserved this issue for Grier's appeal. Therefore, our standard of review of the district court's refusal to give Grier's instruction is whether Grier was prejudiced by this refusal. *See Hamling v. United States*, 418 U.S. 87, 134–35, 94 S.Ct. 2887, 2916, 41 L.Ed.2d 590 (1974). However, because we hold that Harper did not preserve this issue, as he failed to propose jury instructions and object to the court's failure to give such instructions, we review his claim under the more stringent "plain error" standard. *See United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir.1987).

Turning to the substantive law applicable to review of the jury instructions given in both defendants' cases, in *United States v. Douglas*, 818 F.2d 1317, 1320–21 (7th Cir. 1987), we held that

> "[a] defendant is entitled to an instruction on his or her theory of defense if: the defendant proposed a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; *and* the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial."

(Emphasis added) (citations omitted). We have repeatedly emphasized that when reviewing instructions we consider them as a whole in determining whether or not a court erred in refusing to give a particular instruction. In *United States v. Fournier*, 861 F.2d 148, 150 (7th Cir.1988), we stated:

> "'It is axiomatic that in determining the propriety of instructions they are to be viewed as a whole. As long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal.'"

(quoting *United States v. Perlaza*, 818 F.2d 1354, 1358 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987) quoting, in turn, *United States v. Patrick*, 542 F.2d 381, 389 (7th Cir.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977)). We further explained the importance of construing the instructions in light of the context of the overall trial in our recent decision in *United States v. Bailey*, 859 F.2d 1265, 1277 (7th Cir. 1988):

> "When examining the sufficiency of jury instructions we must examine the jury charge as a whole, rather than focus on isolated passages. Moreover, because '"a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence and instruction of the jury by the judge,"' we review the instructions in the context of the overall trial and the arguments by counsel. *See United States v. Piccolo*, 835 F.2d 517, 519 (3d Cir.1987) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 [94 S.Ct. 396, 400, 38 L.Ed.2d 368] (1973))."

The thrust of the defendants' argument is that the conspiracy charge actually given the jury "lumped all the defendants together." We disagree. When these instructions are viewed as a whole, they address

---

**28.** Grier's proposed multiple conspiracy instruction read as follows:

"You must determine whether the conspiracy charged in the indictment existed, and, if it did, who its members were. If you find that the conspiracy charged did not exist, then you must return a not-guilty verdict, even though you may find that some other conspiracy existed. Similarly, if you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though the defendant may have been a member of some other conspiracy."

the importance of determining the guilt of each defendant individually in clear and concise language. The instructions, a copy of which went with the jury for their deliberations, in relevant part, provided the following guidance to the jury in making their conspiracy determination:

"41. In determining whether the alleged conspiracy existed, you may consider the actions and statements of all the alleged participants. The agreement may be inferred from all the circumstances and the conduct of all the alleged participants.

42. In determining whether a defendant became a member of the conspiracy, you may consider only the acts and statements of that particular defendant.

43. To be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which the purpose was to be accomplished. However, the government must prove beyond a reasonable doubt, from the defendant's own acts and statements, that he was aware of the common purpose and was a willing participant."

The district court judge also instructed the jury:

"If you find one or more isolated purchases of cocaine by a defendant for personal use, this does not by itself make that defendant a member of the conspiracy charged in Count I. In order to be a member of that conspiracy, a defendant must be aware of the general purpose of the conspiracy and have some interest in its success. In determining whether a particular buyer of cocaine had an interest in the success of the conspiracy, you may consider all the circumstances related to that particular buyer, including the number of purchases, the quantity purchased, and any evidence that the buyer expected to make additional purchases from the seller."

And, further,

"Although the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so, you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his or her case decided on the evidence and the law applicable to him or her."

■ Our examination of these instructions, thus, leads us to only one logical conclusion, that the jury instructions, when viewed in their entirety, properly separate the individual defendants from one another and require the jury, the finder of fact, to individually determine whether each defendant was a member of a single conspiracy. Taking cognizance of the fact that the defense attorney participated in the jury selection process, we have specifically recognized that a properly instructed jury, like the one in this case, is able to properly separate evidence in a multi-defendant trial:

"Williams contends that [he was] denied ... a fair trial because the jury was unable to compartmentalize the evidence as it applied to him. Juries, however, are presumed capable of sorting through the evidence and considering the cause of each defendant separately. And although this case involved multiple counts, several co-defendants, and several tape recordings admitted into evidence, we do not think that the case was of such a magnitude that the jury was unable to follow the court's instructions with respect to compartmentalizing the evidence as it related to each defendant."

*United States v. Williams,* 858 F.2d 1218, 1225 (7th Cir.1988).

Grier and Harper attempt to evade the conclusion that the jury instructions in this case fairly addressed the "single" or multiple conspiracy issue in their individual cases by citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), to support their argument that they were prejudiced by the district court's failure to instruct the jury regarding multiple conspiracies. *Kotteakos* involved the trial of 13 individuals accused of conspiring to obtain fraudulent loans from a single individual who induced lending institutions to make the loans on the basis of false and fraudulent information. In that case, unlike this one, the government did not assert

that the evidence established a single conspiracy. Here, as noted previously, the jury could find that Grier and Harper knew or should have known that other individuals were involved in the conspiracy and that the benefits they received were probably dependent on the success of the single venture. Thus, the facts of this case point toward a single conspiracy finding.

While the district court could properly have instructed the jury on the possibility of multiple conspiracies, it was not required to do so, and after reading the record, we are convinced that under the facts and circumstances presented here, failure to do so did not prejudice Grier and Harper in a manner that denied them a fair trial. As the Supreme Court has "repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.'" *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). In reaching the determination that no prejudice existed, we are mindful of the Supreme Court's mandate that:

> "In criminal causes ... [the] outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. *It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision ... [i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand."*

*Kotteakos v. United States*, 328 U.S. 750, 764, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946) (emphasis added). After reviewing the instructions in their entirety as given to the jury in the present case, our "conviction is sure that ... [failure to give the multiple conspiracy instruction] did not influence the jury, or had but a very slight effect." *Id.* Viewed as a whole, the instructions treat the single conspiracy issue "fairly and accurately." Thus, we are con-

vinced that the failure to give the multiple conspiracy instruction did not prejudice Grier, because this failure had a very slight effect, if any, on the verdict. It necessarily follows that Harper's showing falls far short of establishing the more stringent requirement of "plain error" which is required for a reversal of Harper's conviction. Accordingly, for the reasons stated previously, neither defendant was improperly denied a multiple conspiracy instruction.

## VI. THE LEGALITY OF THE SEARCH OF HARPER'S RESIDENCE

During trial Harper sought to suppress admission of evidence obtained in the search of his residence on the basis that government agents failed to comply with 18 U.S.C. § 3109, which states in its entirety:

> "The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

In an affidavit attached to the motion, Mrs. Harper alleged that:

> "On November 30, 1984, at approximately 8 p.m., I was at home, in bed with my husband, Isaac Harper. The first notice that I was given of the federal officer's intention to search my home was their sledgehammer hitting the door of my home. Up to and until that time, the federal officers did not identify themselves, give notice of their authority or of their purpose. Upon the request of my husband, the federal officers identified themselves and requested admittance for the first time. At that time, my husband and I complied with their request, and allowed the federal officers to search our home."

(Paragraph omitted).

The district court judge refused to rely upon the untimeliness of the suppression motion and instead reached the merits. In ruling the judge stated:

> "I'm willing to accept, at least for the purpose of this ruling, the affidavit of

Mrs. Harper. In reading that affidavit and also reading the statute, I think under the facts of this case that [the officers] didn't break open the outer door and they did not break open an inner door.

In paragraph 5 of her affidavit she states 'Upon the request of my husband, the federal officers identified themselves and requested admittance for the first time. At that time my husband and I complied with their request and allowed the federal officers to search the home.' So they didn't break down the door.

MR. HUPY (Harper's attorney): They were in the process.

THE COURT: This doesn't say that. I am not saying that they wouldn't have broken it down, but they didn't break it down. And they were admitted into the house. Consent was given. Under the facts submitted to the court. So therefore the search was legal."

Although the district court did not need to even rule upon this motion because of its untimeliness,[29] the court's decision on the merits was proper. We have recently held that:

"A district court's denial of a motion to suppress evidence will be affirmed on appeal unless it is clearly erroneous. We will rely on the district court's findings of fact absent a showing of clear error. This standard applies to the district court's findings on the credibility of witnesses, findings that will not be reversed unless clearly erroneous. 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)."

29. *See* Federal Rule of Criminal Procedure 12(b)(3) (requiring motions to suppress evi-

*United States v. D'Antoni*, 856 F.2d 975, 978–79 (7th Cir.1988) (citations omitted).

We agree with the district court's factual finding that the doors were not broken down and conclude that this finding was not clearly erroneous. Mrs. Harper's own affidavit states that the doors were not broken down and the officers were admitted to the premises by Mr. and Mrs. Harper. Thus, even if based solely upon Mrs. Harper's affidavit, the district court's finding is certainly a "permissible view of the evidence." This is all that must be shown for us to conclude that the trial judge's disposition was free from clear error. Accordingly, even if based solely upon Harper's evidence, the district court's finding that the facts did not support a violation of 18 U.S.C. § 3109 was not "clearly erroneous." Thus, the search was proper and the motion to suppress was properly rejected.

The jury verdicts in this case are based on sufficient evidence and the trial court judge did not commit reversible error. Therefore, the jury's verdicts against Grier and Harper are

AFFIRMED.

dence to be presented prior to trial).