UNITED STATES of America,
Plaintiff–Appellee,

v.

Barry ROSE, Defendant–Appellant.

No. 92–3599.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1993.

Decided Jan. 3, 1994.

Andrew B. Baker, Jr., Asst. U.S. Atty., Office of U.S. Atty., Dyer, IN, Denis E. Buckley (argued), Jennifer J. Sackett, Legal Clerk on brief, Office of U.S. Atty., South Bend, IN, for plaintiff-appellee.

Jeffrey N. Cole (argued), Andrew T. Staes, Cole & Staes, Chicago, IL, for defendant-appellant.

Before CUMMINGS, COFFEY and ROVNER, Circuit Judges.

COFFEY, Circuit Judge.

Barry Rose ("Rose") was charged in a four-count indictment with two counts of aiding and abetting the transportation and receiving of a stolen motor vehicle (a "Bobcat" tractor and trailer) in violation of 18 U.S.C. § 2 and 18 U.S.C. §§ 2312 and 2313, and with two counts of aiding and abetting the transportation and receiving of stolen goods other than a motor vehicle in violation of 18 U.S.C. § 2, 18 U.S.C. §§ 2314 and 2315. After Rose was convicted by a jury on all four counts, the district court granted the defendant's motion to arrest judgment on Counts III and IV pursuant to Fed.R.Crim.P. 34,[1] and Rose was thereafter sentenced on Counts I and II to three years probation with four months home confinement, fined $10,000, ordered to make restitution to the tractor and trailer's lawful owner in the amount of $19,700 less any salvage value agreed upon between the parties and the victim, and directed to pay a special assessment of $100. We affirm.

## BACKGROUND

In 1988, Barry Rose was a businessman with a net worth of approximately $6.2 million. Jerry Sevik ("Sevik") was a convicted thief with a long criminal history. After a chance meeting through their mutual interest in snowmobiling, Sevik and Rose became friends, with Sevik testifying that Rose paid him $200 per week to perform mechanical work and run errands at Rose's Lemont, Illinois snowmobile shop.

In December 1988, Sevik, along with Joseph Muratori ("Muratori") and Richard Yanni ("Yanni") stole a new $16,500 Bobcat tractor, and a $3,000–$3,500 tractor trailer, from the Case Power & Equipment Co. in Schereville, Indiana. Sevik and his partners

---

1. In granting the defendant's Rule 34 motion, the court determined that Counts Three and Four, which charged Rose with possession of stolen goods "other than" a motor vehicle, were "wholly inapplicable to the conviction rendered in this case."

towed the tractor on the trailer directly to Rose's snowmobile shop from the scene of the crime, where they left the tractor and trailer sitting outside the shop's locked fence at 1 a.m. in the morning on or about December 20, 1988. Later that same day, Sevik returned to Rose's shop and removed the vehicle identification number ("VIN") from the tractor and replaced its ignition switch.

Shortly thereafter, Rose directed his accountant, Donna Cullen ("Cullen"), to cash an $11,000 check and to set aside $8,000 of this money to pay for the tractor and trailer. When Sevik arrived to pick up the money, Cullen called Rose in order that she might confirm that she should turn the $8,000 in cash over to Sevik. She handed Sevik the envelope containing the cash, and Sevik in return handed her a set of owners' manuals and a receipt (which had neither a VIN nor an invoice number and named a fictitious "C.L. Boyde" as the seller). The Bobcat was kept at the snowmobile shop for several weeks and used for snow removal on the premises as well as at Rose's nearby home. Several weeks later, Rose directed that the tractor and trailer be re-located and transferred to his mother's Missouri farm ("Rosebrook Farm").

In March of 1991, FBI Agent Denson Burkhead ("Burkhead") arrested Sevik at Rosebrook Farm for an unrelated crime and reported this arrest to Rose, who was also present at the farm. In November, Agent Burkhead received information from another FBI office that there might be a stolen tractor at Rosebrook Farm. Armed with this information, he returned to the farm and requested and obtained permission from the farm manager to inspect Rose's tractor. Upon inspection, Burkhead determined that the tractor was without a VIN number and that the brand name plate attached to the vehicle had been painted over and obliterated with gray paint.

Thereafter, Burkhead returned once again and obtained the farm manager's permission to remove the tractor from the premises and arranged for its conveyance to the Pike County, Missouri, Sheriff's Department where it was impounded. Burkhead later called the Case manufacturing plant and learned the location of the tractor's hidden serial number. After locating this hidden number on the Bobcat the agent confirmed that it was indeed stolen. Several months later, Burkhead determined that the serial number on the trailer had likewise been illegally altered. He then arranged for the trailer to be transported to the Pike County Sheriff's Department as well.

Rose went to trial and at trial, the government contended that circumstantial evidence established that Rose very well knew he was purchasing a stolen tractor and trailer from Sevik, the convicted criminal (thief). An FBI agent testified that Rose had volunteered a number of false exculpatory statements in which he claimed, among other things, that Sevik did not work for him or have any involvement in the sale or purchase of the tractor. Sevik and Muratori were also called by the prosecution and testified regarding their theft of the tractor, their long criminal records, and their relationship with the defendant. We agree with the jury's verdict that the government witnesses clearly established that the totality of the facts and circumstances surrounding the purchase of the tractor, including its 1 a.m. delivery, the removal of its VIN number, and the painting over of its name plate, as well as its condition and price, was inconsistent with Rose's claim that he, a successful businessman, had no reason to suspect the tractor was stolen. Rose testified in his own defense and denied having any knowledge that the tractor was stolen. He stressed that the government had presented no direct evidence that he had such knowledge, and he argued that the circumstantial evidence was as consistent with his innocence as it was with his guilt. The defendant also flatly denied having made any false exculpatory statements regarding his relationship with Sevik, but obviously the jury determined that his credibility on many issues was less than desirable.

## ISSUES

On appeal, the defendant contends that the evidence was insufficient to support his conviction and that several of the prosecutor's remarks to the jury constituted plain error, including his comments that Rose has taken

"real good care" of Jerry Sevik, that Rose had associated with convicted thieves, and that Rose had approved the tractor's 1 a.m. delivery.

## DISCUSSION

### A. Sufficiency of the Evidence

■ A defendant urging that his conviction be overturned because it was not supported by sufficient evidence "carries a heavy burden." *United States v. Campbell,* 985 F.2d 341, 344 (7th Cir.1993) citing *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.1992). It is well-settled that "we review the evidence in the light most favorable to the government, and if we determine that a rational jury could have found the defendant guilty, we will affirm the conviction." *Id.* (citing *Burrell,* 963 F.2d at 987).

■ Rose argues that although the offense of receiving and transporting a stolen motor vehicle requires proof that the defendant had knowledge that the vehicle was stolen, the government offered no direct evidence that he had such criminal intent but relied upon circumstantial evidence. This is true, but as we will discuss in more detail, there is nothing novel about establishing a crime through the use of circumstantial evidence. *United States v. Moore,* 936 F.2d 1508, 1524 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 607, 116 L.Ed.2d 630 (1991). Moreover, it is accepted that a jury's verdict may rest solely upon circumstantial evidence. *United States v. Grier,* 866 F.2d 908, 923 (7th Cir.1989). Case law recites that "circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." *Id.* A jury's verdict may not rest "solely on the piling of inference upon inference," *Moore,* 936 F.2d at 1524, but:

> "The view that the prosecution's case must answer *all* questions and remove *all* doubts ... of course, is not the law because that would be impossible; the proof need only satisfy reasonable doubt. Indeed, [j]uries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict.... While [c]ommon sense is no substitute for evidence, ... common sense

should be used to evaluate what reasonably may be inferred from circumstantial evidence."

*Id.* (citations and internal quotes omitted).

Likewise, "a reviewing court must use its experience with people and events [in determining] that the evidence correctly points to guilt [to guard] against the possibility of affirming a guilty verdict based solely on an innocent or ambiguous inference." *United States v. Nesbitt,* 852 F.2d 1502, 1511 (7th Cir.1988) (citations and internal quotes omitted), *cert. denied, Nesbitt v. United States,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989).

With these standards in mind, and after our examination of the record, we have determined that the jury might very well have properly inferred Rose's criminal intent from the plethora of circumstantial evidence. First, Rose's accountant, Donna Cullen, testified that Rose had deviated from his usual procedures in purchasing equipment for his mother's Rosebrook Farm operation when he arranged for the purchase of and payment for the stolen Bobcat. Whereas Rose usually purchased his farm equipment from retailers located in the state of Missouri near the farm, on this occasion he bought a tractor and trailer sight unseen from an unknown seller with an unknown address who issued a receipt that included neither the customary identifying VIN number nor an invoice number. In addition, in the past Rose's purchases of new farm equipment were delivered directly to the farm where they would be used, whereas this equipment in this instance was delivered to Rose's Illinois snowmobile shop at a most unusual hour, 1 o'clock in the morning, and later he transferred it to his mother's farm in Missouri. And finally, while his normal and usual purchasing practice was to pay for farm equipment by check, in this instance he paid for the $16,500 tractor and $3,000-plus trailer by directing his accountant to hand Sevik an envelope containing $8,000 in cash, some $11,000 below the value of the stolen tractor and trailer.

Cullen, Rose's accountant, testified that Rose "said we were buying it from someone we did not usually do business with, so we were paying cash for it." She further testi-

fied that although it was not unusual to purchase equipment for Rose's other businesses with cash, this was the only time she had ever been directed to pay for equipment for his mother's farming enterprise with cash, and that "usually they purchased equipment down at the farm [in Missouri], and dealt with people that they knew or knew of them and would accept a check."

The defendant's only explanation for using cash for this transaction rather than writing a check as he normally would was that a person whose name he was unable to remember called him on the phone, represented himself to be the tractor's owner, and insisted on being paid with cash. "He didn't know me," Rose, the successful businessman, testified. "That was his justification [for insisting that I pay him cash], I'm sure." He stated that the unknown caller had asked for $10,000 but agreed to settle for $8,000.

When asked why he had the Bobcat delivered to and stored in his Illinois snowmobile shop (where Sevik removed the tractor's VIN number, painted over its brand name plate and replaced its ignition switch) rather than to the Missouri farm where he planned to use it, Rose testified that he had thought it would be "an unreasonable request" to ask the (unknown) seller to deliver to such a distant location. Although he didn't know where the seller was located, he "just felt as though he was local since Jerry [Sevik] was local, and I just made some assumptions, I assume."

The government also established that the stolen tractor was always kept out of sight inside a barn except when it was in use. In addition, the prosecution highlighted that Sevik's testimony concerning his employment status contradicted Rose's testimony: Sevik testified that Rose personally paid him $200 cash every week to help out at the farm and in the snowmobile shop; Rose testified that he personally had never paid Sevik any money and did not consider him an employee, although his mother may have paid Sevik $200 weekly to work on the farm. Rather, Rose testified, in return for Sevik's willingness to run errands and "help out" around the snowmobile shop, he only bought Sevik an occasional meal and let Sevik drive one of his trucks. The government also proved that

the receipt Cullen (Rose's accountant) testified she received from Sevik for the tractor and trailer lacked the usual identifying VIN and invoice numbers for the tractor and did not refer at all to the trailer. Moreover, the name the receipt listed for the tractor's seller, "C.L. Boyde" was apparently fictitious, as Rose never attempted to offer any evidence to demonstrate that in fact such a person did sell him the trailer. Sevik, on the other hand, testified that he could not recall having given Cullen a receipt.

The government next presented an FBI agent's testimony that Rose had given completely false exculpatory statements on two separate occasions. In both sets of statements Rose appears to have been trying to distance himself from Sevik. The first statements occurred during a November 1990 telephone conversation between Rose and FBI Agent William Farhat ("Farhat") who was looking for Sevik in connection with an unrelated theft. Farhat testified that during this conversation Rose told him that he had last seen Sevik in "April or May of 1990," when in fact (as Rose later conceded at trial), he actually had seen him at a cattle sale at Rosebrook farm just a few days before the agent's phone call. The agent also testified that during this same conversation Rose told him that Sevik had not been employed by him at any time "in any capacity whatsoever," and that he just knew Sevik from snowmobile racing and from his occasionally "hanging around" Rose's snowmobile shop.

The second set of allegedly false exculpatory statements occurred a year later, after Rose's arrest by Farhat in November 1991. Agent Farhat testified that at that time Rose stated that he had purchased the Bobcat for $10,000 when, as Rose testified at trial, he actually paid a total of $8,000 for both the tractor and trailer. Farhat further testified that Rose told him that "there was no way that Sevik was involved in the sale or purchase of the Bobcat to him." Rose denied having ever made this statement and unsuccessfully sought to persuade the jury that Farhat was lying:

> AUSA: Why sir, did you tell the FBI that Jerry Sevik had no involvement in the

sale, the delivery or the purchase of that bobcat?

Rose: I don't think I said delivery or purchase. It's my recollection that I told him that I was not aware that he was aware of that bobcat or had been involved in the purchase of it.

Q. Sir, he was involved in telling you about the bobcat?

A. He didn't own it. I—my response was in regard to him owning it or having ownership in it.

Q. Sir, he was involved in telling you about the bobcat?

A. Correct.

Q. Setting up the deal with the unknown caller?

A. That's correct.

Q. Picking up the money?

A. Yes.

Q. Delivering it down to the farm?

A. Yes.

Q. And you told the FBI that he had no involvement with that bobcat?

A. I—I don't think I meant it in the terms in which it was put on paper by the agent.

Q. The FBI misunderstood you, is that right?

A. It's quite possible.

Q. Well, you heard the FBI agent testify, correct?

A. Yes.

Q. Was he telling the truth or not?

A. I don't think he was, no.

Q. You think he was a liar?

A. That's correct.

The government also introduced the testimony of tractor retailers in the area to the effect that they would find it suspicious and troubling if an unknown seller were to deliver a brand-new, freshly painted and clean tractor and trailer at one o'clock in the morning while demanding a cash payment of $8,000 and producing a receipt lacking both a VIN number and an invoice number. The government further contended that the $8,000 price itself would indicate to a reasonable person that the equipment had been stolen: a sales representative of Case Power and Equipment Co. was called and did testify that the stolen new trailer would retail for about $3,000–$3,500 while the new Bobcat tractor would list for $16,500, although it possibly could have been bought for $15,000.

We disagree with Rose's contention that, with the exception of the false exculpatory statements (which he insists were misreported), all of the above circumstantial evidence is as consistent with innocence as it is with guilt. Initially, Rose contends that he trusted his good friend Sevik to locate this tractor and to handle the details of its purchase, details with which he claims he had no reason to concern himself. But we think a rational juror could have disbelieved Rose's self-contradictory testimony regarding the nature of his relationship with Sevik. On the one hand, Rose did testify that he trusted Sevik to exercise his "mechanical expertise" to select a suitable tractor for him, and that he even trusted him to deliver an envelope stuffed with $8,000 cash to the unknown (mystery man) seller. But on the other hand, Rose also sought to distance himself from Sevik by testifying that Sevik was just someone who sometimes "hung around" the snowmobile shop and ran an occasional errand, a person whom he never employed and about whose personal life he never inquired.

Rose also argues that there is nothing suspicious about keeping farm equipment in a barn when not in use, and notes that there was no attempt to hide the tractor on his business's books, as the tractor was listed and depreciated annually. We agree with one of the defendant's contentions: there is nothing inherently suspicious about keeping a tractor in a barn. But we note, as the jury may well have, that there was other evidence of concealment. Rose's purchase receipt lacked a VIN or invoice number, and his business and tax records apparently lacked any reference whatsoever to the $3,000–plus trailer that was part and parcel of the tractor sale. And although Rose points to the testimony of his accountant that cash purchases were not unusual, that Cullen testified that while it was not unusual to pay cash for *non-farm* equipment, she had never before been

asked to pay cash for equipment bound for Rosebrook Farm.

The defendant also refers us to the testimony of Jack Costenaro ("Costenaro"), the owner of an Illinois business that sells used Bobcats, for evidence that missing VIN and invoice numbers are not suspicious circumstances in the used-tractor trade. But we think the jury was entitled to discount the ridiculous suggestion that VIN numbers are routinely removed from farm equipment prior to their resale, and to note that in any event this was a freshly painted, brand-new tractor with a painted-over name plate, not a used, second-hand tractor. Costenaro also testified that a used Bobcat of the same model and year as the brand-new tractor Rose purchased would have had a retail value of $6,000 or $7,000, although if it was in exceptional condition it could sell for $8,000—the exact price Rose paid. But, again, we are convinced that the jury obviously found that a purchaser of farm equipment is unlikely to mistake a brand-new tractor for a used one.

Finally, Rose in testimony depicted himself to be an honest, wealthy and extraordinarily busy executive who had neither the time nor the inclination to deliberately purchase a stolen tractor in order to save a mere $8,000 or so. He testified that he did not view buying a used tractor for his mother's farm as a significant transaction at a time when his energies were devoted to running his several businesses and to selling one of them, to pursuing a major but unrelated civil litigation, and attempting to stop the imminent dissolution of his marriage. Rose urges that when the tractor is compared to these larger issues in his life, it is understandable that he delegated the details of the tractor's purchase and delivery to Sevik. He contends that with a net worth of $6.5 million, the $8,000 purchase was no more significant to him than a $61 one would be to a person of average net worth, and he stresses that none of the government's witnesses testified that he knew the tractor was stolen.

We have already explained that whether Rose possessed the requisite state of mind required to establish that he knowingly purchased, received and transported the stolen

tractor may very easily be inferred from the surrounding facts and circumstances and need not be shown by direct evidence, *Grier,* 866 F.2d at 923, and that his jurors were free to draw upon their own experience in life as well as their common sense in evaluating the evidence. *Id.* It nevertheless bears repeating that:

> "[C]rimes may be proved entirely by circumstantial evidence...." *United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir.1991). Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable. *United States v. Grier,* 866 F.2d 908, 923 (7th Cir.1989). "If the government proves its case by circumstantial evidence, it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.... The trier of fact is free to choose among various reasonable constructions of the evidence. *United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986)."

*United States v. Moore,* 936 F.2d at 1524 (internal quotes omitted).

And while "[w]e recognize that in reviewing a guilty verdict based on circumstantial evidence, we must insure that the verdict does not rest 'solely on the piling of inference upon inference' ... *neither should we view every bit of evidence in isolation.*" *United States v. Nesbitt,* 852 F.2d at 1511 (7th Cir. 1988) (quoting *United States v. Guzzino,* 810 F.2d 687, 696–97 (7th Cir.1987) (emphasis added)). "Only when the record contains *no* evidence, regardless of how it is weighted, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *Id.* at 1509 (citations omitted).

The record is clear that a reasonable juror could have found that Rose knew the Bobcat was stolen. Initially, the jury could have found that, as a successful businessman who had purchased farm equipment before, and who knew enough to negotiate $2,000 off the seller's asking price for the tractor, Rose also knew enough to suspect that his acquisition of the new $15,000–$16,000 tractor (and the $3,000 trailer that was apparently just thrown in for "free") for a mere $8,000 repre-

sented a most unusual bargain by any standard.

The purchase had other suspicious aspects that the jury was also free to consider. For example, although it had been the defendant's past normal business practice to purchase equipment for Rosebrook Farm from local Missouri retailers, in this instance he agreed to buy $8,000 worth of farm equipment sight unseen, and to have it delivered to his snowmobile shop in Illinois by an unknown seller with an unknown address who demanded to be paid in cash.[2]

And Agent Farhat's testimony about the defendant's false exculpatory statements regarding his relationship with Sevik and Sevik's lack of involvement with the stolen tractor provided the jury with additional circumstantial evidence of guilt. Although false exculpatory statements cannot be the *sole* basis for conviction (*see, e.g., United States v. Scheibel,* 870 F.2d 818, 822 (2d Cir.1989); *United States v. Abraham,* 617 F.2d 187, 191 (9th Cir.1980), *cert. denied,* 447 U.S. 929, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980)), it has been firmly established that "false exculpatory statements made to law enforcement officials are circumstantial evidence and have independent probative force." *United States v. Durrani,* 835 F.2d 410, 424 (2d Cir.1987) (citations omitted).

It is true that the defendant testified to his innocence and denied making any false exculpatory statements, and it is also true, as Rose stresses, that one of his employees, James Morris, testified that Sevik had told him that Rose did not know the tractor was stolen.[3] But the credibility and weight to be assigned the testimony of Rose, Morris, Agent Farhat and the other witnesses was for the trier of fact and not this appellate court to decide. It is well-settled that as a court of appeals, "we will not reweigh the evidence or judge the credibility of witnesses" when reviewing the sufficiency of the evidence. *United States v. Maholias,* 985

F.2d 869, 874 (7th Cir.1993). As we have previously explained, "the credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances." *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.1985), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985).

Thus, there is no doubt that the jury was entitled to believe Special Agent Farhat's testimony over that of Rose and to consider Rose's false exculpatory statements as additional circumstantial evidence of his consciousness of guilt.

The Supreme Court has mandated that we affirm the sufficiency of the evidence if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). And, as previously discussed, in reviewing the evidence in the light most favorable to the government, this court may accept circumstantial evidence as support, "even sole support" for a conviction. *United States v. Olson,* 978 F.2d 1472, 1478 (7th Cir.1992) (citing *United States v. Moore,* 936 F.2d 1508, 1524 (7th Cir.1991)). For not only is circumstantial evidence every bit as probative as direct evidence, but it is entirely proper for the jury to use its common sense "to evaluate what reasonably may be inferred from circumstantial evidence." *Moore,* 936 F.2d at 1524. We are convinced that the evidence of Rose's false exculpatory statements together with the evidence of the incriminating manner in which he arranged, consummated and paid for his purchase of the stolen Bobcat was more than sufficient to permit a reasonable juror to find the defendant guilty beyond a reasonable doubt.

**B. Prosecutorial Misconduct**

The defendant next contends that improper remarks in the government's opening and

---

**2.** Although the defendant's usual practice was to pay for all his purchases of equipment for his mother's farm by check, in this instance he directed his accountant to cash a check, place $8,000 in an envelope, and hand it over to Sevik, an individual whom Rose testified did not work for him but ran errands and "hung around."

**3.** The record does not reveal the basis on which Sevik claimed to be familiar with the mental processes of the defendant.

closing arguments constitute reversible error. "The prosecutor," Rose argues, "aware of the weakness of his case, intentionally misstated the evidence, expressed personal opinions, suggested that he had knowledge not in the record, sought to convict Mr. Rose through guilt by association, and generally embarked upon a course of conduct calculated to mislead and inflame the jury."

As trial counsel failed to object to any of the remarks Rose now characterizes as prejudicial, we review for "plain error" pursuant to Fed.R.Crim.P. 52(b), which provides that "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

In *United States v. Olano,* —— U.S. ——, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Supreme Court recently clarified the proper scope and application of the "plain error" rule. First, the Court explained, the rule provides the courts of appeal with only limited authority to correct "forfeited-but-reversible" errors. To reverse a conviction on the grounds of plain error, we of course first must determine that there truly was "error" and, additionally, that this error was "plain," that is, that the error was "clear" or "obvious" under current law. *Olano* at ——, 113 S.Ct. at 1777. But our analysis does not end there, for the "plain error" rule does not permit us to correct *all* "errors" that are "plain." A third limitation on our appellate authority is that the plain error must "affect substantial rights." *Id.* at ——, 113 S.Ct. at 1777–78. In most cases, this means that the error must be prejudicial: "It must have affected the outcome of the District Court proceedings." *Id.* at ——, 113 S.Ct. at 1778 (citations omitted). Finally, if all three of the above criteria are met, then this court may have the *discretion* to correct the error. *Id.* at ——, 113 S.Ct. at 1778. But even this discretion is not unfettered. The Supreme Court has further directed that the courts of appeal "should not exercise [their discretion to correct forfeited errors under Rule 52(b)] unless the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at ——, 113 S.Ct. at 1776. Finally, the Court admonishes us, "it is the defendant rather than the government" who bears the burden of persuasion under Rule 52(b). *Id.* at ——, 113 S.Ct. at 1778.

█ Accordingly, we will review the defendant's allegations of prosecutorial misconduct to determine whether he has met his burden of proving the existence of a plain error that both affected substantial rights and *seriously* affected the fairness, integrity or public reputation of his trial.

█ Rose first challenges the government's misstatement during its cross-examination of his accountant, Donna Cullen, regarding the date on which Rose instructed her to cash a check and set aside the $8,000 he needed for the tractor purchase. On direct examination, Cullen testified that her records showed she had cashed this check on December 20, 1988. The prosecutor challenged her testimony by eliciting the fact that she worked Monday through Friday, and then stating: "December 20, 1988, Ma'am, is a Saturday ... you would have had to come into work, go to the bank, cash it out and give the money to Mr. Rose on that day. Do you remember doing that?" It was not until later in the trial that defense counsel discovered that December 20, 1988, was in fact a Tuesday. Rose, in what can best be classified a ridiculously far-fetched contention, argues that the specificity and unlikely nature of the prosecutor's misstatement brands it as "intentional and malicious."

We think it highly unlikely that any attorney would risk losing a case by deliberately making such an easily detectable misstatement. Although we are convinced that the prosecutor's misreading of the calendar was nothing more than an unintentional human error, the point is moot in any event. For not only was the error concerning the date clarified for the jury, but also both parties later stipulated at trial to the fact that December 20, 1988, was actually a Tuesday. A review of the record shows that the error actually worked to the defendant's advantage in closing argument by providing him with welcome ammunition with which to blast the prosecutor for trying to "trick" the jury:

"[The prosecutor] was misleading you, ladies and gentlemen. Was misleading you.

Maybe he can explain it. What's he going to say, I made a mistake? Fine. If he can make a mistake then why can't Barry Rose make a mistake; or is Barry Rose a liar? If [the prosecutor] can take Donna Cullen and try to suggest to her she's lying because December the 20th was a Saturday, can he say to you, well, I'm sorry I made a mistake, don't hold that against me. I really didn't mean to do that. Or is that, ladies and gentlemen, again a suggestion that perhaps the Government is bound and determined to do whatever they have to do to convict this man even to the point of attempting to mislead you. Turns out that in fact December the 20th was not a Saturday. In fact, December the 20th was a Tuesday. He tried to twist that young lady who had absolutely nothing at stake in this trial, tried to make her look like a fool...."

■ The defendant next directs our attention to the government's opening statement in which the prosecutor warned the jury that Sevik, his "star witness" would be "horrible" because he would not testify that Rose knew the Bobcat was stolen. The government went on, Rose claims, to imply that the reason Sevik would be a "horrible" witness was that Rose had somehow "gotten" to Sevik and thereby suborned perjury and obstructed justice. The relevant portion of the prosecutor's opening statement reads:

"Mr. Sevik, I would characterize, ladies and gentlemen, is probably a pretty important witness for the government. I also would characterize testimony that he's going to give you is pretty lousy. He's going to be bad. There's no doubt about it. *And all weekend long I'm thinking to myself, how am I going to walk in here today and face you people with a star witness who is horrible. And I tried to analyze why this witness is the way he is. And I'll explain it to you ... Mr. Rose took care of him ... Mr. Rose took real good care of Jerry Sevik.* Every time I asked Jerry Sevik about specific details dealing with this crime as they relate to that man right there, Barry Rose, his answer is, I don't remember, or I'm not sure, or I can't recall. Every time. *That bothers me. It should bother you. And I would submit to*

*you, ladies and gentlemen, that I think there is a reason....*

(Emphasis supplied).

The defendant contends that, by telling the jury that Rose had been "real good" to Sevik, the prosecutor meant to imply that, as a wealthy man, Rose had somehow used his money and influence to persuade Sevik not to testify truthfully. This in turn, Rose concludes, improperly suggested that the government had information not presented at trial that led it to this conclusion. Rose then points out that in fact there is no evidence that he possessed any control or influence over Sevik's testimony, and that, since Sevik had been in prison prior to trial, the only person who had any contact with or power over Sevik was the prosecutor, who had promised to recommend that Sevik be sentenced at the lower end of the Sentencing Guidelines in return for his testimony.

Rose alleges that by the statement "Mr. Rose took real good care of Jerry Sevik," the government meant to imply that Rose had suborned perjury. With this statement we disagree for in our opinion this is nothing more than fair comment on the nature of Rose's friendship with Sevik. The record reveals that Rose himself testified at length to the acts of kindness he, the successful businessman, bestowed on the otherwise unemployed Sevik. "Jerry [Sevik]," Rose testified, "was kind of a—we call them groupies, or kind of a kid that liked to hang around. And actually got be, I considered, a friend. I spent quite a bit of time with Jerry. He was a likeable sort of person." Among other things, Rose testified, "there was a time I had allowed him to drive one of the vehicles that I owned, our racing pickup truck. And he took it—took care of it; in fact, drove it back and forth to home quite a bit." He let Sevik "tag along" with Rose's snowmobile racing team during the winters. Rose "bought [Sevik's] lunch a lot. And dinner." He suggested to his mother that she should put Jerry to work on Rosebrook Farm "for a couple hundred dollars a week, more and likely, and a place to live."

In our opinion, there is no basis in the record for concluding that the prosecutor

meant to infer anything more than that by these acts Rose might have been able to win Sevik's loyalty. But even if we were to agree that the prosecutor's remark could be viewed as ambiguous, which we do not agree with, a court must not lightly assume "that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less' damaging interpretations." *Boyde v. California*, 494 U.S. 370, 385, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990) (quoting *Donnelly v. De-Christoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974)). The government "should not be restricted to a sterile recitation of uncontroverted facts." *United States v. Radtke*, 799 F.2d 298, 310 (7th Cir.1986) (quoting *United States v. Chu*, 779 F.2d 356, 370 (7th Cir.1985)). Thus, "counsel may make arguments reasonably inferred from the evidence presented." *Radtke*, at *id.* We think the argument that Sevik may have felt some obligation to Rose is such a reasonable inference from the evidence presented at trial.

■ Likewise, we reject the defendant's contention that the prosecutor committed plain error when he stated in his closing argument that Rose "had the tractor delivered in the middle of the night." The evidence showed that Rose negotiated the purchase price and agreed to have the tractor delivered to his Illinois shop rather than to the Missouri farm where he planned to use it. Having also established Rose's familiarity with the other details of that transaction, including the cash payment, the place of delivery, the unidentified seller, and the plainly ridiculous price for the brand-new tractor and trailer, it was not unreasonable for the prosecutor to infer that Rose (the self-described "successful businessman") was familiar with each and every detail—including the delivery time. The defense, of course, was free to disagree with this inference and to argue accordingly, and the record shows that this is precisely what it did, contending that the highly suspicious nature of the 1 a.m. delivery was itself evidence that Rose did *not* approve of it:

"Now if Barry Rose were going to have a piece of stolen equipment delivered to his place in Lemont, would he tell someone just bring it here in the middle of the night, drop it off out here next to my place of business where it is well lit, where it is patrolled by security police, and just leave it there? Does that make sense? ... Look at this garage door. Don't you think he would be there or have someone there to open that door and to put that thing in the garage where it could not be seen.... Is that the type of thing this ingenious thief that the Government wants you to believe Barry Rose is capable of doing?"

■ There is no plain error where the prosecutor's argument is reasonably inferred from the evidence and the defense had an adequate opportunity to respond. *See Radtke*, 799 F.2d at 310.

■ The defendant's belated objection that the government made a "guilt by association" argument to the jury is also without merit. Although Rose contends that the prosecution deliberately sought to taint his character by stressing his association with the thieves Sevik and Muratori, the record shows that the government merely presented the jury with relevant information pertaining to the criminal backgrounds of two of its witnesses, and acknowledged the friendship of Rose and Sevik.

As "evidence" of the government's attempt to convict him through guilt by association, Rose points to the U.S. Attorney's trial tactic of beginning his direct examination of his chief witnesses by revealing their criminal records. Although Rose argues that there was no conceivable reason for the government to elicit this testimony from its own witnesses other than for the purpose of seeking to persuade the jury to convict the defendant through guilt by association, this type of questioning is a common and proper trial strategy to head off the impeachment of one's own witnesses' credibility. "Minimizing the 'sting' of an opponent's impeachment by initiating the impeachment yourself is a time-honored trial tactic ... one practiced by prosecutor and defendant alike." *United States v. Ewings*, 936 F.2d 903, 909 (7th Cir.1991) (citing *United States v. Marroquin*,

885 F.2d 1240, 1246–47 (5th Cir.1989), *cert. denied,* 494 U.S. 1079, 110 S.Ct. 1807, 108 L.Ed.2d 938 (1990) (prior acts of dishonesty); *United States v. Davis,* 838 F.2d 909, 917–18 (7th Cir.1988) (plea agreements); *United States v. Frappier,* 807 F.2d 257, 259 (1st Cir.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1629, 95 L.Ed.2d 203 (1987) (bias); *United States v. Koppers Co.,* 652 F.2d 290, 299 (2d Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 617 (1981) (prior inconsistent statements); *United States v. Faymore,* 736 F.2d 328, 334 (6th Cir.), *cert. denied,* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984) (witness's ability to perceive event).

> "A trial is not just combat; it is also truthseeking; and each party is entitled to place its case before the jury at one time in an orderly, measured, and balanced fashion, and thus spare the jury from having to deal with bombshells later on. It is on this theory that defense counsel, in beginning their examination of a defendant, will often ask him about his criminal record, knowing that if they do not ask, the prosecutor will do so on cross-examination. What is sauce for the goose is sauce for the gander."

*Id.* (quoting *United States v. LeFevour,* 798 F.2d 977, 984 (7th Cir.1986)).

Although the defendant might prefer a rule requiring all government witnesses to be pillars of their communities, it is a fact of life that "hot" merchandise tends to be sold by crooks, and that "in this imperfect world, a litigant must often take the witness as he or she is, imperfections and all. We cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, priests, and nuns; that is why one of the jury's roles is to decide the credibility of witnesses." *United States v. Rovetuso,* 768 F.2d 809, 818 (7th Cir.1985), *cert. denied,* 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986). The government, then, cannot be faulted for calling to the stand Sevik and Muratori, the admitted thieves of the very tractor Rose is charged with unlawfully receiving and transporting. As the Supreme Court explained in a case challenging the summoning of certain grand jury witnesses:

> "It is entirely appropriate—indeed imperative—to summon individuals who may be able to illuminate the shadowy precincts of corruption and crime. Since the subject matter of the inquiry is crime ... it is unrealistic to assume that all of the witnesses capable of providing useful information will be pristine pillars of the community untainted by criminality. The Court has never ignored this reality of law enforcement. Speaking for the Court in *Kastigar v. United States,* Mr. Justice Powell said: '[M]any offenses are of such a character that the only persons capable of giving useful testimony are those implicated in the crime.' 406 U.S. [441] at 446, 92 S.Ct. [1653] at 1657."

*United States v. Mandujano,* 425 U.S. 564, 573–74, 96 S.Ct. 1768, 1775, 48 L.Ed.2d 212 (1976).

Rose also points to the following italicized passages in the prosecutor's closing remarks as employing a so-called "guilt by association" tactic:

> "Now you have to ask yourself, why cash? Why not a check, like he always does business. Well, the answer is pretty obvious. *The deal was for Jerry Sevik, a convicted felon, a multiple thief, a good buddy of Barry's.*"

Later in the same closing argument the record shows the U.S. Attorney stating:

> "[Rose] tells us that Jerry Sevik is a trusted friend, that he trusts his judgment. Jerry Sevik the thief. Jerry Sevik the *convicted felon.* Jerry Sevik the man who just hung around Barry Rose. *And one of the things you have to ask yourself, why did a guy like Barry Rose, a multimillionaire even hang with these guys. Why did he hang around with Jerry Sevik. How did he know Joe Muratori, is that coincidence? They are thieves.*"

But because, as we have just discussed, to buy a stolen tractor or any other piece of "hot" merchandise one necessarily must deal with underworld characters who have access to such unsavory characters as burglars, thieves and robbers, we think it was entirely proper for the prosecutor to truthfully observe and the jury to believe that in all probability Rose did in fact employ, associate

and do business with such questionable characters. Thus we are not at all persuaded that it was error for the prosecutor to inform the jury that, although the defendant characterized himself as a purely honest businessman who would never stoop so low as to receive stolen goods, the evidence demonstrated that he nevertheless chose to associate with the very thieves who admitted to stealing the Bobcat tractor in this case.

 Although we are convinced that there was no prosecutorial error on the facts of this case, we will also point out that even if there had been, such error would not be grounds for reversal unless "the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986). Moreover, we will not overturn a criminal conviction "on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed *in context:* only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Neely,* 980 F.2d 1074, 1083 (7th Cir.1992) (quoting *United States v. Young,* 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1984) (emphasis added)).

We have also held that "the defense's opportunity to rebut the prosecutor's improper remark is a factor militating against a finding of prosecutorial misconduct." *United States v. Phillips,* 914 F.2d 835, 845 (7th Cir.1990) (citing *Darden v. Wainwright,* 477 U.S. 168, 182–83, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986)). Here the record discloses that defense counsel vigorously responded to the prosecution's closing remarks in his own closing argument:

"And don't believe a word that Barry Rose tells you, because after all he associates with bad people, and therefore, must be bad himself. Now, that's a new standard, by the way, ladies and gentlemen, of justice in this country. A new standard of guilt invented, I would suggest to you, this very morning by [the Assistant U.S. Attorney] who says to you that he was aiding and abetting the transportation of this stolen vehicle because he associated with the individuals who committed the crime. Guilt by association. Goes back to the time, I suppose, when we were all small children, and parents said to all of us, be careful who you associate with because you will cast in the same line. It's all right to do that when you are trying to raise children. It's good advice. And maybe it's good advice for adults, be careful who you associate with because the dye will cast off and spill off onto you. And you will be stained as well. But is that proof beyond a reasonable doubt that the person has committed a crime?"

The record further shows that, in his rebuttal argument, the prosecutor specifically asked the jury *not* to convict Rose on a guilt by association theory:

"We are not alleging that by mere association Barry Rose is guilty of this crime. That's not a crime, just to associate ... And if you go back and you convict the man because he's wealthy, then an injustice will definitely be done. Don't do that. Because there is more than enough evidence to prove independent of his wealth. Independent of just his association that he's guilty of this crime, and that's why you should find him guilty. Thank you."

The record also demonstrates that, in addition to hearing both the defense rebuttal and the prosecutor's curative remarks in his own rebuttal, the jury was properly instructed by the court that:

"Opening statements of counsel are for the purpose of acquainting you in advance with the facts counsel expect the evidence to show. Closing arguments of counsel are for the purpose of discussing the evidence. Opening statements, closing arguments and other statements of counsel should be disregarded to the extent they are not supported by the evidence."

We refuse to assume that the jury nevertheless ignored these limiting instructions and treated counsel's arguments as if they themselves were evidence. "We rely on our belief that juries heed the instructions." *United States v. Severson,* 3 F.3d 1005, 1015 (7th Cir.1993) (citing *United States v. Neely,* 980 F.2d 1074, 1085 (7th Cir.1992) ("Our

theory of trial relies upon the ability of a jury to follow instructions.")

As the Supreme Court has observed, "arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence ... and are likely viewed as the statements of advocates...." *Boyde,* 494 U.S. at 384, 110 S.Ct. at 1200.

Thus we agree with the Eighth Circuit that "if an arguably improper statement made during closing argument is not objected to by defense counsel, we will only reverse under exceptional circumstances." *United States v. Eldridge,* 984 F.2d 943, 947 (8th Cir.1993) (quoting *United States v. Nabors,* 761 F.2d 465, 470 (8th Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 123 (1985)). We hold that no such exceptional circumstances are presented here, where the defense exercised its opportunity to respond to the prosecutor's arguments, the court issued a proper limiting instruction, and the other circumstantial evidence would still permit the jury to find Rose guilty beyond a reasonable doubt.

The judgment of the jury is

AFFIRMED.